# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MUSTAFA AHMED AL-HAWSAWI,<br><br>Petitioner,<br><br>v.<br><br>JOSEPH R. BIDEN JR. et al.,<br><br>Respondents. | Civil Action No. 21-cv-2907 (RJL) |

## RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS & MOTION TO DISMISS OR FOR JUDGMENT

BRIAN M. BOYNTON
Acting Assistant Attorney General

TERRY M. HENRY
Assistant Director

INDRANEEL SUR
KEVIN WYNOSKY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

    I.     Petitioner's Claims................................................................................................ 2

    II.    Petitioner's Medical Care at Guantanamo ........................................................... 4

ARGUMENT.................................................................................................................... 6

    I.     The Court should enter judgment for Respondents on Petitioner's Eighth
          Amendment claims because Respondents have not been deliberately
          indifferent to Petitioner's medical needs. ............................................................ 6

    II.    The Court should either dismiss Petitioner's request for a mixed medical
          commission for lack of subject-matter jurisdiction or deny it on the merits. ....... 10

         A.    Legal Framework .................................................................................... 12

         B.    The Court lacks jurisdiction to order Respondents to convene a
              mixed medical commission in Petitioner's case. ..................................... 18

         C.    Even if the Court has jurisdiction, equitable principles counsel
              against convening a mixed medical commission..................................... 23

         D.    In all events, Petitioner is not entitled to the requested injunction. .......... 26

              i.     Petitioner is not entitled to a mixed medical commission as
                     a matter of law. ........................................................................... 26

              ii.    The balance of harm and the public interest weigh against
                     the requested injunction. .............................................................. 31

CONCLUSION.................................................................................................................. 32

**TABLE OF AUTHORITIES**

**CASES**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ........................................................................ 18, 21, 22, 26

*Abbott v. Abbott*,
  560 U.S. 1 (2010) ...................................................................................................... 24

*Abdulrazzaq v. Trump*,
  422 F. Supp. 3d 281 (D.D.C. 2019) ............................................................................ 7, 9, 10

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) .................................................................................... 24

*Ahmed v. Obama*,
  613 F. Supp. 2d 51 (D.D.C. 2009) ............................................................................... 31

*Al Odah v. United States*,
  406 F. Supp. 2d 37 (D.D.C. 2005) ................................................................................ 7

*Al Warafi v. Obama*,
  716 F.3d 627 (D.C. Cir. 2013) .................................................................................... 27

*Al-Adahi v. Obama*,
  596 F. Supp. 2d 111 (D.D.C. 2009) ............................................................................... 7

*al-Qahtani v. Trump*,
  443 F. Supp. 3d 116 (D.D.C. 2020) ........................................................................ 17, 21, 23

*Al-Marri v. Rumsfeld*,
  360 F.3d 707 (7th Cir. 2004) ...................................................................................... 2

*Al-Zahrani v. Rodriguez*,
  669 F.3d 315 (D.C. Cir. 2012) .................................................................................... 18

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ................................................................................................. 26

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ............................................................................................... 7, 18

*Brown v. District of Columbia*,
  514 F.3d 1279 (D.C. Cir. 2008) .................................................................................... 9

ii

*Chevron Oil Co. v. Andrus*,
  588 F.2d 1383 (5th Cir. 1979) ............................................................................ 30

*Davis v. U.S. Sentencing Commission*,
  716 F.3d 660 (D.C. Cir. 2013) ...................................................................... 19, 20

*Department of Homeland Security v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ......................................................................................... 19

*Dhiab v. Obama*,
  74 F. Supp. 3d 16 (D.D.C. 2014) ........................................................................... 7

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .............................................................................................. 26

*Estelle v. Gamble*,
  429 U.S. 97 (1976) .......................................................................................... 7, 8, 9

*Farmer v. Brennan*,
  511 U.S. 825 (1994) .......................................................................................... 8, 9

*Fay v. Noia*,
  372 U.S. 391 (1963) .............................................................................................. 23

*Francis v. Henderson*,
  425 U.S. 536 (1976) .............................................................................................. 23

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................................ 2

*Hamdan v. Rumsfeld*,
  415 F.3d 33 (D.C. Cir. 2005) ......................................................................... 13, 29

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) ....................................................................................... 12, 13, 29

*Heggestad v. U.S. Dep't of Justice*,
  182 F. Supp. 2d 1 (D.D.C. 2000) .......................................................................... 30

*Hernandez v. Stephens*,
  No. 3:13-cv-1391, 2014 WL 667373 (N.D. Tex. Feb. 20, 2014) ......................... 20

*Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.*,
  587 F. Supp. 2d 13 (D.D.C. 2008) ........................................................................ 26

*Holmes v. Laird*,
   459 F.2d 1211 (D.C. Cir. 1972) .......................................................................... 24

*In re al-Nashiri*,
   835 F.3d 110 (D.C. Cir. 2016) ............................................................................ 10

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)......................................................................................... 28

*Kiyemba v. Obama*,
   561 F.3d 509 (D.C. Cir. 2009) ............................................................................ 18

*Knight v. United Land Ass'n*,
   142 U.S. 161 (1891)............................................................................................. 30

*LaFaut v. Smith*,
   834 F.2d 389 (4th Cir. 1987) ................................................................................ 8

*Morrow v. Clayton*,
   326 F.2d 36 (10th Cir. 1963) .............................................................................. 30

*Muhammad v. Close*,
   540 U.S. 749 (2004)............................................................................................. 19

*Munaf v. Geren*,
   553 U.S. 674 (2008)....................................................................................... 19, 23

*Nettles v. Grounds*,
   830 F.3d 922 (9th Cir. 2016) .............................................................................. 20

*Nichols v. Truscott*,
   424 F. Supp. 2d 124 (D.D.C. 2006) .................................................................... 26

*Nielsen v. Rabin*,
   746 F.3d 58 (2d Cir. 2014)..................................................................................... 8

*O.K. v. Bush*,
   344 F. Supp. 2d 44 (D.D.C. 2004) ........................................................................ 7

*Rabbani v. Obama*,
   76 F. Supp. 3d 21 (D.D.C. 2014) ...................................................................... 7, 8

*Razzoli v. Federal Bureau of Prisons*,
   230 F.3d 371 (D.C. Cir. 2000) ............................................................................ 19

*Rhodes v. Chapman*,
  452 U.S. 337 (1981)..................................................................................................... 8

*Rumsfeld v. Padilla*,
  542 U.S. 426 (2004)..................................................................................................... 2

*Russello v. United States*,
  464 U.S. 16 (1983)..................................................................................................... 26

*Salahi v. Obama*,
  No. CV 05-0569 (RCL), 2015 WL 9216557 (D.D.C. Dec. 17, 2015).......................... 20, 21, 23

*Schlesinger v. Councilman*,
  420 U.S. 738 (1975)................................................................................................... 10

*Skinner v. Switzer*,
  562 U.S. 521 (2011)............................................................................................. 18, 19, 20

*Sumitomo Shoji Am., Inc. v. Avagliano*,
  457 U.S. 176 (1982)................................................................................................... 24

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015)..................................................................................... 22

*United States ex rel. Hyde v. McGinnis*,
  429 F.2d 864 (2d Cir. 1970)........................................................................................ 7

*United States v. Hamidullin*,
  888 F.3d 62 (4th Cir. 2018) ................................................................................... 27, 28

*United States v. Hennis*,
  75 M.J. 797 (A. Ct. Crim. App. 2016), *aff'd*, 79 M.J. 370 (C.A.A.F. 2020) ........................... 30

*Wilkinson v. Dotson*,
  544 U.S. 74 (2005)............................................................................................. 18, 19, 20

*Wilson v. Seiter*,
  501 U.S. 294 (1991)..................................................................................................... 8

*Withrow v. Williams*,
  507 U.S. 680 (1993)............................................................................................... 23, 24

**STATUTES**

10 U.S.C. § 948a........................................................................................................... 29

10 U.S.C. § 7013 ................................................................................................................. 30

10 U.S.C. § 7031 ................................................................................................................. 30

10 U.S.C. § 7032 ................................................................................................................. 30

28 U.S.C. § 2241 ........................................................................................................... *passim*

28 U.S.C. § 2243 ................................................................................................................. 23

42 U.S.C. § 1983 ................................................................................................................. 18

## REGULATIONS

Executive Order 13,567,
   76 Fed. Reg. 13,277, 13,277 (Mar. 7, 2011) ........................................................... 3, 20

## OTHER AUTHORITIES

Army Reg. 190-8,
   https://perma.cc/UZQ9-59K7 ......................................................................................... *passim*

Department of Defense (DoD) Instruction 2310.08,
   https://perma.cc/7VV7-GJ5U ............................................................................................. 5

DoD Directive 2310.01E (issued Aug. 19, 2014),
   https://perma.cc/FFB4-YR67 ............................................................................................ 28

DOD Directive 2310.01E (issued May 24, 2017),
   https://perma.cc/K6JK-ULLK .......................................................................................... 28

DoD Directive 2310.01E (issued Sep. 18, 2020),
   https://perma.cc/ N8ZL-T4AE ............................................................................... 27, 28, 30

DoD Directive 5101.1,
   https://perma.cc/R3UL-JDPD ......................................................................................... 30

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in
   Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 31,
   https://perma.cc/SPH7-2XXP ............................................................................................. 7

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
   6 U.S.T. 3316, 75 U.N.T.S. 135,
   https://perma.cc/H2EC-4EP3 ...................................................................................... 10, 11

Int'l Committee of the Red Cross, *Commentary on the Third Geneva Convention* (1960), https://perma.cc/H89D-BEYC ........................................................................................ 15

Office of General Counsel, U.S. Dep't of Def., *Law of War Manual* (2016), https://perma.cc/HYH5-5EYL ................................................................................ 14, 28

Referred Charges, *United States v. Khalid Shaikh Mohammad et al.* (Military Commissions Trial Judiciary Apr. 4, 2012), https://perma.cc/TG4Y-USJY .......................................................................................... 3

Ruling, *United States v. Khalid Shaikh Mohammad et al.* (Military Commissions Trial Judiciary Apr. 25, 2018), https://perma.cc/CB5Q-NMJW .................................................................................... 29

White House Press Secretary announcement of President Bush's determination re legal status of Taliban and Al Qaeda detainees (Feb. 7, 2002), https://perma.cc/79EL-NGAZ .............................................................................. 13, 28

**INTRODUCTION**

Petitioner Mustafa Ahmed al-Hawsawi challenges the qualifications and effectiveness of the board-certified physicians and dedicated medical staff serving at the United States Naval Station at Guantanamo Bay, Cuba. He requests an injunction of indefinite scope and duration that would make this Court the superintendent of all his medical care at Guantanamo. Additionally, he asks the Court to compel under Army Regulation 190-8 his examination by a mixed medical commission, an entity contemplated under the Third Geneva Convention to, among other things, examine whether an enemy detainee who is entitled to prisoner-of-war status is eligible for medical repatriation to the Power for which he was fighting.

The United States takes seriously its obligation to care for detainees in its custody. But Petitioner has not advanced any claim for relief that would support the extraordinary injunction he seeks. Petitioner is not entitled to choose his own doctor or to dictate a particular course of medical treatment. Instead, to prevail on a claim alleging improper care, Petitioner must at a minimum demonstrate that Respondents have been deliberately indifferent to his medical condition. Yet even according to Petitioner's own allegations, U.S. medical officers have actively treated his conditions and otherwise provided him careful and attentive medical care. These acknowledged efforts have included a special diet, various therapeutic modalities, multiple procedures (including two surgeries), and multiple consultations with specialist physicians. Petitioner criticizes this treatment, but differing opinions over medical judgment do not demonstrate deliberate indifference. As the accompanying classified supplement and supporting declaration shows, Petitioner receives comprehensive medical care, often by the same specialist physicians who treat the service members stationed at Guantanamo and their families.

1

Nor does the Petition provide any basis for ordering Respondents to convene a mixed medical commission. As an initial matter, the request for such a commission falls outside the Court's limited habeas jurisdiction because even if granted, such relief would not necessarily result in Petitioner's release or otherwise directly affect his detention's duration or form, especially given that Petitioner is subject to ongoing U.S. military commission proceedings. And even if the Court had jurisdiction, equitable principles would counsel against exercising it, because courts generally accord the Executive Branch great deference in administering military affairs and interpreting treaty obligations. Additionally, Petitioner's request fails on the merits: he is not legally entitled to a mixed medical commission, and the balance of harms otherwise tips decisively in the Executive's favor.

Accordingly, the petition for a writ of habeas corpus should be dismissed for lack of jurisdiction or denied on the merits, with judgment entered for Respondents.[1]

## BACKGROUND

### I. Petitioner's Claims

Petitioner is a Saudi national detained at Guantanamo Bay as an alien unlawful belligerent. He faces capital charges before a military commission related to his alleged role in the September 11, 2001 terrorist attacks. *Accord* Mem. Order 1, *Al-Hawsawi v. Obama*, No. 15-cv-1257 (RJL) (D.D.C. Sept. 10, 2015), ECF No. 13. Those charges include conspiracy, attacking civilians, intentionally causing serious bodily injury, murder in violation of the law of war, hijacking or

---

[1] In addition, the Court should dismiss Petitioner's claims against the President, who is not properly named as a respondent in a habeas petition brought by an alien detainee because "[s]uits contesting actions of the executive branch should be brought against the President's subordinates." *Al-Marri v. Rumsfeld*, 360 F.3d 707, 708 (7th Cir. 2004); *see Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality op.); *id.* at 826-27 (Scalia, J., concurring in part and concurring in the judgment); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 436 & n.9 (2004).

hazarding a vessel or aircraft, and terrorism. *See* Referred Charges, *United States v. Khalid Shaikh Mohammad et al.* (Military Commissions Trial Judiciary Apr. 4, 2012), *available at* https://perma.cc/TG4Y-USJY. As a military commissions defendant, he is not eligible for review by the Periodic Review Board (PRB), an administrative body that "review[s] on a periodic basis" whether continued detention of a detainee is "necessary to protect against a significant threat to the security of the United States." Executive Order 13,567, 76 Fed. Reg. 13,277, 13,277 (Mar. 7, 2011).

Petitioner claims that he was healthy until he entered CIA custody in 2003. Pet. ¶¶ 13–15 (ECF No. 1). He alleges that he experienced "non-consensual forceful rectal penetration" in CIA custody that has led to "chronic colorectal and digestive conditions." *Id.* ¶¶ 1, 18, 28–86. Despite acknowledging that Petitioner has been seen by numerous general practitioners, general surgeons, gastrointestinal physicians, and other specialists throughout his detention, *id.* ¶¶ 66, 91–94, and that he has been provided with a special diet as well as various medications, treatments, and procedures to diagnose and treat his conditions, *id.* ¶¶ 49, 50, 52, 53, 57, 59, 60, 62–64, 66, 70–74, 76, 77, the Petition argues that the medical providers who have treated him throughout the course of his detention lacked "the qualifications necessary to treat his chronic digestive and colorectal problems" and "neglected to promptly address" his medical issues. *Id.* ¶¶ 112, 145. The Petition also contends that Petitioner's alleged nonconsensual forceful rectal penetration resulted in "a Dysfunction of the Gut-Brain Interaction" (DGBI) that can only be treated by a psychotherapist permitted to discover any "underlying mental trauma." *Id.* ¶¶ 128, 155, 156.

The Petition asserts four claims for relief. *First*, the Petition raises an Eighth Amendment claim alleging that Respondents' failure "to promptly address" Petitioner's medical complaints and "undue delays in treatment" caused his diarrhea to worsen into several other chronic issues,

3

including "neck pain" and "[sacroiliac] joint dysfunction." *Id.* ¶¶ 140–47. *Second*, the Petition asserts an Eighth Amendment claim alleging that "Respondents have continued to treat Petitioner with Medical Staff who are not qualified to treat Petitioner's severe and chronic colorectal problems" or his alleged "Gut-Brain Dysfunction." *Id.* ¶¶ 148–52. *Third*, the Petition raises an Eighth Amendment claim directly challenging Respondent's failure to provide a psychotherapist permitted to discover any "underlying mental trauma" to treat Petitioner's alleged DGBI. *Id.* ¶¶ 153–56. *Fourth*, the Petition asserts a claim seeking the Petitioner's medical repatriation under Army Regulation 190-8. *Id.* ¶¶ 157–64.

Based on those claims, the Petition seeks two forms of relief. *First*, the Petition seeks an injunction—of indefinite scope and duration—requiring the Executive "to submit a plan for [Court] approval . . . detailing the methods by which respondents will: provide consistent and timely medical care; provide care by qualified medical professionals; and medically address the trauma arising from Respondents' sexual abuse underlying Petitioner's colorectal issues." *Id.* at 19. *Second*, the Petition seeks an injunction requiring the Executive both to convene a mixed medical commission to determine Petitioner's eligibility for medical repatriation and also— apparently notwithstanding any commission determination—to repatriate Petitioner to Saudi Arabia. *Id.* at 20.

## II.  Petitioner's Medical Care at Guantanamo

A classified supplement and supporting declaration filed contemporaneously with this motion provides more background on the medical care provided at Guantanamo generally and to Petitioner in particular. The supplement makes clear that the medical staff has the ability to ask Petitioner about anything medically relevant to his care. It also describes Petitioner's repeated refusal of treatment and disregard for medical advice and recommendations.

Petitioner is one of fifteen high-value detainees (HVD) who were formerly in CIA custody before being transferred to Guantanamo. HVDs currently reside in Camp V. Camp V's medical staff consists of two licensed, board-certified physicians—a family doctor who serves as the primary care manager, and a psychiatrist—assisted by a team of nurses and medical corpsmen. The physicians typically serve at least a nine-month tour of duty, overlapping with their predecessor for a two-week orientation period that includes joint meetings with each detainee and a review of each detainee's medical records and current course of treatment. The corpsmen provide routine medical support, and serve as both the first point-of-contact for most medical matters as well as emergency first responders. The medical staff also has interpreters available to assist as necessary. *See* Decl. ¶¶ 3–6, 8.

Department of Defense (DoD) Instruction 2310.08 establishes DoD policy that health care personnel, including the medical staff at Guantanamo, will "[p]rovide appropriate medical care, in the context of a provider–patient treatment relationship and established principles of medical practice, to detainees in the control of the DoD." *See* https://perma.cc/7VV7-GJ5U. The Camp V medical staff takes its duties seriously, approaching each interaction with a detainee as an opportunity to develop a rapport that will increase provider–patient trust and encourage the detainee to participate in his medical treatment. The medical staff treat detainees in accordance with their needs and with the accepted standard of care; medical decisions and treatment are not made or withheld as a form of punishment or discipline. All told, the medical staff work diligently to provide timely, compassionate, quality healthcare with the goal of evaluating, protecting, and improving detainees' physical and mental health. *See* Decl. ¶¶ 9–10.

Camp V's medical suite consists of an examination room used for routine visits plus designated rooms for physical therapy, dentistry, and optometry. There are also functioning

medical/surgical wards, behavioral health rooms, fully stocked medical supply rooms, and a pharmacy. In the event of an emergency, HVDs can be immediately transported to the U.S. Naval Hospital Guantanamo Bay as needed for additional care. The hospital also provides consultative services from various medical specialists, who also provide care to the service members stationed at the base and their families. The medical staff endeavors to have the same specialists who previously examined or treated HVDs return for subsequent evaluations. *See* Decl. ¶¶ 5–7.

**ARGUMENT**

The Court should enter judgment for Respondents on Petitioner's claims seeking judicial supervision of his medical care because Respondents have not acted with deliberate indifference to Petitioner's medical needs. On the contrary, Respondents have consistently addressed Petitioner's medical complaints and utilized specialists as necessary.

The Court also should dismiss Petitioner's request for a mixed medical commission (MMC) for lack of jurisdiction because the request does not sound in habeas, and therefore falls outside the Court's jurisdiction under 28 U.S.C. § 2241(e)(2). Alternatively, if the Court determines that it has jurisdiction and chooses to exercise it despite equitable principles counseling forbearance, the Court should enter judgment for Respondents, because Petitioner is not entitled to an MMC under the Third Geneva Convention, Army Regulation 190-8, or applicable DoD policy. And even if he were to receive an MMC, the MMC determination would not effect his release, because he is the subject of ongoing military commission proceedings.

**I.   The Court should enter judgment for Respondents on Petitioner's Eighth Amendment claims because Respondents have not been deliberately indifferent to Petitioner's medical needs.**

Petitioner raises three Eighth Amendment claims concerning his medical treatment at Guantanamo. Although this case does not involve pretrial or other detention in a domestic

6

criminal-law setting in which the Eighth Amendment applies, other Judges of this Court have treated challenges to medical care of Guantanamo detainees as analogous to Eighth Amendment medical-care claims and have evaluated such claims under the deliberate-indifference standard. *See, e.g.*, *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 286 (D.D.C. 2019); *Rabbani v. Obama*, 76 F. Supp. 3d 21, 24-26 (D.D.C. 2014); *Dhiab v. Obama*, 74 F. Supp. 3d 16, 23-24 (D.D.C. 2014); *Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 120 (D.D.C. 2009); *Al Odah v. United States*, 406 F. Supp. 2d 37, 42-44 (D.D.C. 2005); *O.K. v. Bush*, 344 F. Supp. 2d 44, 61-62 (D.D.C. 2004); *cf.* Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field art. 12, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 31, 38 (wounded and sick persons entitled to prisoner-of-war status during international armed conflict on land "shall not wil[l]fully be left without medical assistance and care"), *available at* https://perma.cc/SPH7-2XXP. Indeed, deliberate indifference is the minimum that a Guantanamo detainee must show to challenge his medical care at the Guantanamo military detention facility—especially because Guantanamo habeas petitioners may not necessarily assert the full panoply of constitutional rights applicable in other prison litigation contexts. *Cf. Boumediene v. Bush*, 553 U.S. 723, 783 (2008) ("Habeas corpus proceedings need not resemble a criminal trial.").

Under the deliberate-indifference standard, Petitioner "has no right to the specific 'type or scope of medical care which he personally desires.'" *Rabbani v. Trump*, No. 05-1607, Slip Op. at 16, 21 (D.D.C. Feb. 27, 2018) (ECF No. 398) (quoting *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970)). His requests for a particular type of doctor, for a particular individual to treat him, or for a particular treatment for his alleged DGBI, are thus "largely irrelevant" to the Court's judgment here. *Id.* at 15-16; *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether . . . [certain] diagnostic techniques or forms of treatment [are]

7

indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

Nor may a petitioner "artificially manufacture a deliberate indifference claim" by "refus[ing] to participate in his own healthcare, turn[ing] down repeated offers of care, and then claim[ing] medical neglect." *Rabbani*, Slip Op. at 16; *see also id.* at 9 (collecting cases declining "to find that there has been deliberate indifference to a serious medical need when that medical need is the result of or exacerbated by the petitioner's voluntary decisions"). As explained in the classified supplement, Petitioner has repeatedly refused to take the steps within his power to facilitate his own treatment and to follow his doctors' advice. Such refusals do not support a deliberate indifference claim.

Instead, Petitioner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *see Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ("Whether one characterizes the treatment received by the prisoner as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle*." (quoting *LaFaut v. Smith*, 834 F.2d 389, 391-92 (4th Cir. 1987) (Powell, J.))). Deliberate indifference includes both an objective and a subjective component.

Objectively, Petitioner must establish that Respondents' actions "pos[ed] a substantial risk of serious harm" amounting to "the denial of 'the minimal civilized measure of life's necessities.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In the medical treatment context, the substantial risk must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Rabbani*, Slip Op. at 9 (quoting *Nielsen v. Rabin*, 746 F.3d 58, 66 (2d Cir. 2014)).

8

Subjectively, Petitioner must establish that Respondents "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety." *Farmer*, 511 U.S. at 837. It is not enough to show that U.S. officials at Guantanamo knew "of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Id.* Nor is it enough to show medical malpractice or negligence. *See Estelle*, 429 U.S. at 105-06; *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008). Rather, the subjective component of the deliberate-indifference standard requires that officials actually "kn[ew]" that Petitioner "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Petitioner cannot make either showing. The Petition itself acknowledges that Petitioner has received frequent medical attention and treatment over many years throughout his detention to treat the conditions he asserts in the Petition. Additionally, as the classified supplement makes clear, the medical personnel attending to Petitioner are neither posing nor disregarding any risk to his health or safety. Rather, they are actively working to manage both Petitioner's digestive tract issues and his other health conditions, which include high blood pressure and a recent bout with post-viral pneumonia. Further, the typical nine-month rotation of medical officers' duty tours does not evince deliberate indifference; if anything, the two-week overlap between incoming and outgoing providers, as well as efforts to have consistency in the specialists seeing detainees like Petitioner, demonstrate sensitivity to continuity of care.

In *Abdulrazzaq v. Trump*, the Court rejected a deliberate indifference claim where the "Petitioner's own allegations [in that case] . . . demonstrated that his condition ha[d] been evaluated, monitored, and treated throughout his detention," and where "[t]he reasonable inference . . . drawn from Petitioner's allegations . . . [was] that he disagree[d] with the medical decisions that ha[d] been made and/or that those decisions amount[ed] to negligence." 422 F. Supp. 3d at

288. This Court should likewise reject Petitioner's claims in this case. Indeed, given the extensive medical interventions acknowledged by Petitioner, and those detailed by Respondents' classified declaration, it is clear that the medical officers at Guantanamo have not been deliberately indifferent to Petitioner's health needs.

*   *   *

Alternatively, to the extent that any of Petitioner's claimed conditions might affect his ability or capacity to participate in his ongoing military commission proceedings, this Court should abstain from deciding the merits of his Eighth Amendment claims under principles reflected in *Schlesinger v. Councilman*, 420 U.S. 738 (1975), applied with respect to the military commission context by *In re al-Nashiri*, 835 F.3d 110, 118-28 (D.C. Cir. 2016). Petitioner has ample opportunity and every incentive to raise any capacity or participation issue in those parallel proceedings, which "adequately protect his rights." *Id.* at 122, 124-25. And "the need for federal courts to avoid exercising their equitable [habeas] powers in a manner that would unduly impinge on the prerogatives of the political branches in the sensitive realm of national security" provides an "important countervailing" reason for a habeas court to refrain from deciding an issue capable of being raised in those proceedings. *Id.* at 124.

## II. The Court should either dismiss Petitioner's request for a mixed medical commission for lack of subject-matter jurisdiction or deny it on the merits.

Petitioner also asks this Court to order Respondents to convene an MMC under Army Regulation 190-8 to determine his eligibility for medical repatriation. *See* Pet. ¶ 2 & p. 20. Army Regulation 190-8 "establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees" consistent with the United States's obligations under the Geneva Conventions, including the Geneva Convention Relative to the Treatment of

Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, *available at* https://perma.cc/H2EC-4EP3, commonly referred to as the "Third Geneva Convention." *See* Army Reg. 190-8 at i & § 1-1(b), *available at* https://perma.cc/UZQ9-59K7 [hereinafter AR 190-8]. In particular, section 3-12 of the regulation is part of DoD's implementation of the medical-repatriation provisions of the Third Geneva Convention, which offers MMCs for seriously ill prisoners of war during international armed conflict. But section 3-12 does not entitle Petitioner to relief for three reasons.

*First*, the Court lacks subject-matter jurisdiction to grant such relief. A claim for injunctive relief requiring Respondents to convene an MMC does not sound in habeas because it will not necessarily affect the fact, duration, or form of Petitioner's confinement. So it falls outside this Court's jurisdiction under 28 U.S.C. § 2241(e)(2).

*Second*, and alternatively, even if Petitioner's MMC claim were to sound in habeas, the Court should refrain from exercising any authority to decide the claim as a matter of equity. Petitioner asks this Court to compel unprecedented and burdensome Executive action purportedly through a Department of the Army regulation which was promulgated to help the military implement DoD policy and specific treaty obligations, but counter to the Executive's considered interpretation about those obligations' scope and applicability, as well as the Executive's interpretation of the regulation and controlling DoD policy. Such relief would be inconsistent with the great deference that courts give the Executive on military operations and on treaty interpretation.

*Third*, Petitioner fails to justify the requested injunctive relief. On the merits, the Third Geneva Convention's medical repatriation provisions apply to sick and wounded prisoners of war belonging to a Power engaged in an international armed conflict. But Petitioner is a member of a

11

nonstate terrorist organization and is not detained in an international armed conflict. So the treaty's medical repatriation provisions do not apply—a longstanding U.S. Government conclusion confirmed by a January 2021 memorandum by the Secretary of the Army. As a result, Petitioner does not face any irreparable injury, and both the public interest and the balance of the equities favor Respondents.

### A.  Legal Framework

1.  Army Regulation 190-8 implements various aspects of the 1949 Geneva Conventions, including the Third Geneva Convention, which offers certain protections to certain categories of enemy persons detained during an armed conflict. *See* AR 190-8 § 1-1(b) (further noting that "[i]n the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence"). Under the Third Geneva Convention, the scope of protections that a state is obliged to offer depends on the type of armed conflict: either international or non-international. Whether an armed conflict is international or non-international depends on the legal status of the parties involved in the armed conflict: either a state (in the language of the Convention, a "High Contracting Party" or a "Power" that accepts and applies the provisions of the Convention); or a nonstate armed group. *See generally Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006).

The Convention's full protections apply in the context of international armed conflicts: "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties" and other Powers. *See* Third Geneva Convention, art. 2. Those protections include, in certain instances, prisoner-of-war status. Article 4 defines prisoners of war, principally as (1) members of the armed forces of a state that is a party to the conflict as well as members of militias or volunteer corps forming part of such armed forces, and (2) members of

12

other militias or volunteer corps belonging to a state that is party to the conflict that are commanded by a responsible superior officer, have fixed distinctive insignia, carry arms openly, and conduct their operations in accordance with the laws of war, including by refraining from conducting attacks against civilians. *Id.* art. 4(A)(1) & (2). And article 5 extends provisional prisoner-of-war protection to enemy persons detained during such international armed conflicts, in cases of doubt about whether such persons belong to any of the categories of persons entitled to prisoner-of-war status, until their eligibility under article 4 can be determined by a competent tribunal.

The Convention includes narrower protections for "armed conflict[s] not of an international character," *id.* at art. 3—in other words, conflicts "not involv[ing] a clash between nations," *Hamdan*, 548 U.S. at 630. States engaged in non-international armed conflicts must provide detained enemy nonstate personnel with certain protections enumerated in article 3, including that "[detained persons] shall in all circumstances be treated humanely" and that the sick and wounded receive care. *See* Third Geneva Convention art. 3. But article 3 does not require enemy nonstate personnel detained during non-international armed conflict to be treated as prisoners-of-war.

Because al-Qaida is a nonstate terrorist organization rather than a High Contracting Party (or even a Power), the U.S.–al-Qaida conflict is a non-international armed conflict. *See Hamdan*, 548 U.S. at 630-31; *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring). Accordingly, detained members of al-Qaida are not entitled to prisoner-of-war status.[2] Rather, under the Third Geneva Convention, they are entitled only to the humane treatment protections enumerated in article 3. *See Hamdan*, 548 U.S. at 630-31.

---

[2] In 2002, President Bush concluded that because al-Qaida is a terrorist organization that is not and cannot be a Party to the Third Geneva Convention, al-Qaida's fighters are unprivileged enemy combatants to whom the full protections of the Geneva Convention do not apply. *See* White House Press Secretary announcement of President Bush's determination re legal status of Taliban and Al Qaeda detainees (Feb. 7, 2002), *available at* https://perma.cc/79EL-NGAZ.

2. Section 3-12 of Army Regulation 190-8 implements the Third Geneva Convention's medical repatriation provisions. Article 109 of the Convention requires parties to international armed conflicts to repatriate "seriously wounded and seriously sick prisoners of war." Article 110 allows conflicting parties "to determine" through mutual agreement "the cases of disablement or sickness entailing direct repatriation." Absent a special agreement between the parties, the parties should apply "the principles laid down" in a model agreement set forth as Annex I to the Convention. Convention art. 110.

Article 112 calls for the appointment of MMCs to "examine sick and wounded prisoners of war, and to make all appropriate decisions regarding them." Procedures governing the "appointment, duties, and functioning of these Commissions" are set forth in Annex II to the Convention. *Id.* art. 112. Annex II requires MMCs to have three members: one appointed by the Detaining Power plus two from "a neutral country" "appointed by the International Committee of the Red Cross, acting in agreement with the Protecting Power" and "approved by the Parties to the conflict." *Id.* Annex II, art. 1-3. If the International Red Cross cannot appoint neutral members, appointment falls to the Protecting Power—"the Power protecting the interests of the prisoners of war to be examined."[3] *Id.* Annex II, art. 5. MMC repatriation decisions are "made by a majority vote." *Id.* Annex II, art. 10. Under Annex II, MMC repatriation decisions must be executed by the Detaining Power "within three months of the time when it receives due notification of such

---

[3] "Under international law, a State that lacks normal diplomatic relations with a second State may, with the consent of the second State, designate a third State to act to protect the first State's interests as they relate to the second State. This third State is often called a Protecting Power." *See* Office of General Counsel, U.S. Dep't of Def., *Law of War Manual* § 18.15 (2016), *available at* https://perma.cc/HYH5-5EYL.

decisions."[4] *Id.* Annex II art. 10 & 12. But for prisoners of war detained in connection with a judicial prosecution or conviction, article 115 of the Convention provides that the Detaining Party retains discretion about whether to execute an MMC decision to repatriate. *See* art. 115 ("Prisoners of war detained in connection with a judicial prosecution . . . who are designated for repatriation . . . may benefit by such measures before the end of the proceedings or the completion of the punishment, if the Detaining Power consents."); *cf.* art. 119 (At the close of hostilities, "[p]risoners of war against whom criminal proceedings for an indictable offence are pending may be detained until the end of such proceedings, and, if necessary, until the completion of the punishment. The same shall apply to prisoners of war already convicted for an indictable offence."); *see also* Int'l Committee of the Red Cross, *Commentary on the Third Geneva Convention* 536 (1960), *available at* https://perma.cc/H89D-BEYC ("It is for the Detaining Power to decide whether a wounded or sick prisoner of war detained in connection with a judicial prosecution or conviction shall be allowed to benefit by repatriation or accommodation in a neutral country under Article 110, paragraphs 1 and 2.").

Section 3-12 adopts Annex II's composition and procedural requirements. *See* AR 190-8 § 3-12(a)(2). It further makes certain categories of enemy prisoners of war (EPW) and retained personnel (RP) generally "eligible for direct repatriation": "EPW and RP suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent"; and "[s]ick or wounded EPW and RP whose conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury." *Id.* § 3-12(*l*).

---

[4] Once repatriated, former detainees are not to be employed by the receiving Power in active military service in the conflict.  *See* art. 117 ("No repatriated person may be employed on active military service.").

Army Regulation 190-8's glossary defines "enemy prisoners of war" and "retained personnel." Both definitions underscore section 3-12's applicability to only international armed conflicts. For example, "Enemy prisoner[s] of war" are "detained person[s] as defined in Articles 4 and 5 of the [Third] Geneva Convention"—"[i]n particular, one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy." *Id.* at 33. "Retained personnel" include "medical personnel" meeting certain requirements; "[c]haplains"; and "[s]taff of National Red Cross societies and other voluntary aid societies duly recognized and authorized by their governments." *Id.*; *accord id.* § 3-15(b).

The glossary also addresses "Other Detainee[s]." "Other Detainee[s]" are "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as" enemy prisoners of war, retained personnel, or civilian internees (a category understood with reference to the Fourth Geneva Convention). *Id.* at 33. Other Detainees "shall be treated as EPWs until a legal status is ascertained by competent authority." *Id.* This definition implements article 5 of the Third Geneva Convention, which (as noted) extends provisional prisoner-of-war protection to enemy persons detained during international armed conflicts until their eligibility for prisoner-of-war status can be determined.

3.  The Secretary of the Army has authority "to approve exceptions to" Army Regulation 190-8 "consistent with controlling law and regulation." *See infra* note 10. The Secretary of the Army issued a memo early last year exercising that authority, consistent with the authorities discussed above, to "make clear that AR 190-8 is not applicable to any detainees held at [Guantanamo]." Memorandum from Ryan D. McCarthy, Sec'y of the Army, to Commander, U.S. Southern Command 2 (January 11, 2021) (attached as Exhibit A) [hereinafter SecArmy Memo].

16

The Secretary's memo addressed Army Regulation 190-8's applicability following a decision by another district court in this Circuit, *al-Qahtani v. Trump*, 443 F. Supp. 3d 116 (D.D.C. 2020) (Collyer, J.). In 2005, Mohammed al-Qahtani, another Guantanamo detainee, brought a habeas petition challenging his detention. That case had been stayed at al-Qahtani's request since 2010. But in 2017, al-Qahtani filed a motion asking the Court to use its All Writs Act authority to compel the government to facilitate his examination by an MMC. *See* 443 F. Supp. 3d at 121. Al-Qahtani was not the subject of ongoing military commission proceedings at the time of his motion.

More than two years later, the district court granted al-Qahtani's motion. Despite acknowledging that the government had previously determined both that al-Qahtani was a member of al-Qaida, and that al-Qaida fighters are not entitled to prisoner-of-war status under the Convention, the court nonetheless concluded that al-Qahtani was an "Other Detainee" who must be treated as an enemy prisoner of war under Army Regulation 190-8. *Id.* at 130. In doing so, the court misunderstood the regulation—which is one part of DoD's implementation of the Third Geneva Convention—to *expand* the Convention's medical repatriation privileges for prisoners of war to members of nonstate terrorist organizations who do not qualify for prisoner-of-war status. (Indeed, the Court never addressed the Convention's distinction between international and non-international armed conflicts or between the requirements of Convention article 3 and prisoner-of-war privileges.) The government took an interlocutory appeal, which the D.C. Circuit, in an unpublished order, dismissed for lack of jurisdiction. *See Al Qahtani v. Trump*, No. 20-5130 (D.C. Cir. Sept. 29, 2020). The case has since been reassigned, and the government's motion for reconsideration of the Court's MMC order, based on the Secretary of Army's January 2021 memorandum clearly excepting Guantanamo detainees from Army Regulation 190-8, is currently subject to briefing before Judge Friedman.

17

**B.  The Court lacks jurisdiction to order Respondents to convene a mixed medical commission in Petitioner's case.**

As an initial matter, Petitioner's demand for an injunction ordering the Executive Branch to convene an MMC lands outside the relief that 28 U.S.C. § 2241(e) permits. That provision withdrew federal court jurisdiction over Guantanamo detainees' habeas actions, § 2241(e)(1), and over any other action related to the detainees' detention, transfer, treatment, trial, or conditions of confinement, § 2241(e)(2). Even though the Supreme Court deemed § 2241(e)(1) unconstitutional as applied to Guantanamo detainees, *see Boumediene*, 553 U.S. at 792, § 2241(e)(2) still divests courts of jurisdiction over "[im]proper claim[s] for habeas relief," *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009). Simply put, "if petitioners' claims do not sound in habeas, their challenges 'constitute[] an action other than habeas corpus' barred by section 2241(e)(2)." *Aamer v. Obama*, 742 F.3d 1023, 1030 (D.C. Cir. 2014) (alteration in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012)).

Claims that only *potentially* result in release—like Petitioner's claim for an MMC—do not sound in habeas. *Skinner v. Switzer*, a case outside the Guantanamo context, aptly illustrates the point. 562 U.S. 521 (2011). When a domestic prisoner filed a 42 U.S.C. § 1983 claim seeking access to evidence for DNA testing, the Supreme Court rejected the State's argument that the claim should have been filed as a habeas petition, explaining that "when a prisoner's claim would not 'necessarily spell speedier release,'" the claim is not cognizable under habeas. *Id.* at 535 n.13 (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)). Indeed, the Supreme Court has never "recognized habeas as . . . an available [remedy] where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'" *Id.* at 534 (second, third, and fourth alterations in original) (quoting *Wilkinson*, 544 U.S. at 86 (Scalia, J., concurring) (concluding such relief "would utterly sever the writ from its common-law

18

roots")); *see also Muhammad v. Close*, 540 U.S. 749, 754-55 (2004) (per curiam) (holding a petitioner "raised no claim on which habeas relief could have been granted on any recognized theory" because his petition did not "raise any implication about the validity of the underlying conviction" nor "necessarily" "affect the duration of time to be served"). And "claims for *future* relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration) are yet more distant from" the habeas cause of action. *Wilkinson*, 544 U.S. at 82. Likewise here, petitioner's claim to an MMC would not necessarily result in release from detention and therefore lies outside habeas.

The Supreme Court recently confirmed in *Department of Homeland Security v. Thuraissigiam* that habeas cannot be used "to obtain . . . administrative review" that only might result in release. 140 S. Ct. 1959, 1963 (2020). There, an alien unlawfully present in the United States and facing removal sought "a writ of habeas corpus . . . directing [the government] to provide [him] a new opportunity to apply for asylum and other applicable forms of relief." *Id.* at 1968 (second alteration in original) (quoting habeas petition). The Supreme Court held that because the alien sought something other than "simple release," he could not "pursue[]" his claim "through habeas." *Id.* at 1970-71 (first quoting *Munaf v. Geren*, 553 U.S. 674, 693 (2008)).

Even prior to *Thuraissigiam*, the D.C. Circuit strongly suggested that claims such as Petitioner's do not sound in habeas. In *Davis v. U.S. Sentencing Commission*, the Court of Appeals explained that "habeas might not even be *available* for 'probabilistic' claims." 716 F.3d 660, 665 (D.C. Cir. 2013) (citing *Skinner*, 562 U.S. at 534). Based in significant part on that reasoning, the Court of Appeals overturned *Razzoli v. Federal Bureau of Prisons*, 230 F.3d 371 (D.C. Cir. 2000), a decision holding that a claim must be brought in habeas even when it would have merely a probabilistic impact on the duration of custody. *See Davis*, 716 F.3d at 665-66. As the *Davis* court

19

noted, claims sound "in habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration.'" *Id.* at 666 (quoting *Wilkinson*, 544 U.S. at 82).

Although *Davis* did not squarely hold that probabilistic claims do not sound in habeas, the Court of Appeals for the Ninth Circuit subsequently concluded that a claim challenging prison disciplinary proceedings is not cognizable in habeas "[b]ecause success on [the petitioner]'s claims would not necessarily lead to his immediate or earlier release from confinement." *Nettles v. Grounds*, 830 F.3d 922, 935 (9th Cir. 2016) (en banc) (quoting *Skinner*, 562 U.S. at 535 n.13); *cf. Hernandez v. Stephens*, No. 3:13-cv-1391, 2014 WL 667373, at *2 (N.D. Tex. Feb. 20, 2014) ("Petitioner's constitutional challenge to Texas' good-time parole eligibility statute and the denial of a presumptive parole date are not cognizable on habeas review" because "Petitioner would [not] be automatically entitled to accelerated release" if relief were granted).

In the Guantanamo context, *Salahi v. Obama* relied on *Skinner* and *Davis* to conclude that a district court lacked jurisdiction to order the Executive to set a date for a petitioner's hearing before the PRB. *See* No. 05-569, 2015 WL 9216557, at *1-3 (D.D.C. Dec. 17, 2015). Under Executive Order 13,567, if the PRB determines that continued detention is unnecessary to protect against a significant national security threat, it "shall . . . recommend any conditions that relate to the detainee's transfer." 76 Fed. Reg. at 13,278. That determination can be reviewed by a committee of senior Executive Branch officials at the request of one of those officials, and if the PRB determination that a covered detainee does not meet the standard for continued detention becomes final, "the Secretaries of State and Defense shall be responsible for ensuring that vigorous efforts are undertaken to identify a suitable transfer location." *Id.* at 13,279. In other words, a PRB hearing might only possibly result in a detainee's release. On that basis, Judge Lamberth concluded that a Guantanamo detainee's request to force a date for his PRB hearing did not sound in habeas

and thus that the Court lacked jurisdiction under § 2241(e)(2). *Salahi*, 2015 WL 9216557, at *1-3.[5]

This Court should follow *Salahi*. To be sure, *al-Qahtani* distinguished *Salahi* because of "the discretion involved" in PRB "recommendation[s]," and "involved again in the ultimate decision as to whether to actually release a detainee as recommended." 443 F. Supp. 3d at 127-28. In contrast, *al-Qahtani* understood MMC determinations to be a "nondiscretionary release mechanism." *Id.* at 128; *accord id.* at 127 (citing AR 190-8 § 3-12(f)). But that understanding was mistaken. For starters, MMC determinations require commission members to exercise their discretion, and vote, on a factual question about an applicant's eligibility under a medical standard.

Moreover, convening an MMC would require several discretionary steps before that factual question could even be answered. First, under article 110 of the Convention, and following "the principles" of Annex I, the Executive would have to determine the disabilities and sicknesses generally qualifying for repatriation in the U.S.–al-Qaida conflict, when it does not appear that the United States has ever undertaken a similar process (even in international armed conflicts) under the Convention. *See* AR 190-8, § 3-12(a)(2) ("Procedures for a Mixed Medical Commission will be established by [Head Quarters, Department of the Army], according to this regulation and Annex II of the [Third Geneva Convention]."). Then the Executive would have to consider specific standards relating to the severity of those disabilities and sicknesses, which may not even encompass Petitioner's claimed medical conditions. For example, the Executive might reasonably

---

[5] Judge Lamberth also rejected an argument that *Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014), which recognized statutory habeas jurisdiction over a claim by a Guantanamo detainee challenging certain conditions of confinement, establishes that habeas encompasses any claim that some aspect of detention has deprived the detainee of "a right to which he is entitled while in custody," regardless of probabilistic claim considerations. *Salahi*, 2015 WL 9216557, at *3. "[W]hile *Aamer* does show that claims not relating to release may sound in habeas, it does not show that 'probabilistic' or 'discretionary' claims relating to release do so." *Id.*

decide that medical repatriation is unavailable to detainees who decline to adhere to medical recommendations. *Cf.* AR 190-8 § 3-12(*l*)(2) (to qualify for medical repatriation, a medical condition must persist "in spite of treatment"). In all events, this process would raise novel, complex, and difficult issues for the Executive, including considering the potential impact of such standards and procedures in the current conflict or potentially other future conflicts, as well as issues of the safe and orderly operation of the detention facility at Guantanamo and the potential risks that detainees will refuse medical treatment or engage in self-harm so as to avail themselves of whatever standards might be developed. *See also infra* at 24-25. Then, under Annex II of the Convention, the Executive would have to appoint a member to the commission, and coordinate with the International Red Cross for two representatives from neutral countries, subject to the approval of the "parties to the conflict" (i.e., al-Qaida and the United States). If such a commission cannot be established, the United States would have to establish a commission "acting in agreement with the Protecting Power concerned."[6] Of course, those commission members would then need to examine Petitioner, and two members would have to find him eligible under the as-yet-undetermined standards. The "jurisdictional question" of "whether a claim . . . sounds in habeas" should not turn on such a speculative linkage of events. *Aamer*, 742 F.3d at 1033; *cf. Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[P]redicti[ng] that separate [] proceedings will result in [a particular outcome] hypothesizes as to the outcome of future legal proceedings, and is thus 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (final alteration in original)).

---

[6] As the attached declaration of Steven W. Dalbey explains, doing so would be impossible in the context of the U.S.–al-Qaida conflict: "Al-Qaida is not a State and does not have diplomatic relations, and, in the current conflict, no State has been designated as a Protecting Power for al-Qaida's interests." Declaration of Steven W. Dalbey ¶ 5 (May 4, 2020) (attached as Exhibit B); *see also supra* note 3.

22

Additionally, this case presents yet another layer of discretion, a layer absent from *al-Qahtani*: because Petitioner is a military commission defendant, even if an MMC deemed Petitioner eligible for medical repatriation, the Executive would not have to repatriate him until commission proceedings concluded and Petitioner served any sentence. *See supra* at 15 (citing Convention articles 115 and the Red Cross's corresponding commentary). So even assuming that an MMC convened for al-Qahtani could have functioned as a "nondiscretionary release mechanism" (for the reasons explained above, it would not have), that would not be true of an MMC convened for Petitioner. *Al-Qahtani*, 443 F. Supp. 3d at 128. As was true in *Salahi*, as characterized by the court in *al-Qahtani*, there would be considerable "discretion involved" in any MMC determination, and "involved again in the ultimate decision as to whether to actually release [Petitioner] as recommended." *Id.* at 127-28.

At bottom—and at most—Petitioner's request for an MMC presents only the possibility of an ultimate decision that medical repatriation may be appropriate. Accordingly, it falls outside the permitted scope of habeas relief.

### C. Even if the Court has jurisdiction, equitable principles counsel against convening a mixed medical commission.

Alternatively, even if Petitioner's request sounds in habeas, the Court should refrain on equitable grounds from exercising any authority to decide the claim. "Habeas corpus is 'governed by equitable principles.'" *Munaf*, 553 U.S. at 693 (quoting *Fay v. Noia*, 372 U.S. 391, 438 (1963)). So "'prudential concerns' . . . may 'require a federal court to forgo the exercise of its habeas corpus power.'" *Id.* (quoting *Withrow v. Williams*, 507 U.S. 680, 686 (1993), and *Francis v. Henderson*, 425 U.S. 536, 539 (1976), respectively); *see also id.* ("The habeas statute provides only that a writ of habeas corpus '*may* be granted,' and directs federal courts to 'dispose of [habeas petitions] as law and justice require.'" (citations omitted) (alteration in original) (quoting §§ 2241(a) & 2243)).

23

In particular, courts should be wary of "unwarranted judicial intrusion into the Executive's ability to conduct military operations" and to manage its "international relations," especially when the requested relief falls outside the core habeas remedy. *Id.* at 689, 692-93, 700; *see also Adams v. Vance*, 570 F.2d 950, 955 (D.C. Cir. 1978) (noting that "[c]ourts are not in a position to exercise a judgment that is fully sensitive" to "[t]his country's interests in regard to foreign affairs and international agreements"). Relatedly, "it consistently [has] been held that the courts cannot command the United States to take action assertedly necessary to performance of a treaty." *Holmes v. Laird*, 459 F.2d 1211, 1220 (D.C. Cir. 1972) (collecting cases); *see also Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 n.10 (1982))).

Petitioner's MMC request conflicts with the Executive's interpretation of the Third Geneva Convention regarding application of its protections to al-Qaida members. *See supra* note 2 & accompanying text. The request also directly conflicts with the Executive's interpretation of its own regulations implementing the Convention: DoD does not understand Army Regulation 190-8 to apply to Guantanamo detainees detained in the non-international armed conflict with al-Qaida. *See* SecArmy Memo 1; Declaration of Steven W. Dalbey ¶ 3 (May 4, 2020) (attached as Exhibit B) [hereinafter Dalbey Decl.][7]; *see also infra* at 26-30.

What is more, in the attached Dalbey Declaration, DoD's Director for the Office of Detainee Policy explained why convening an MMC under AR 190-8 to examine an al-Qaida

---

[7] The Dalbey Declaration was originally filed in *al-Qahtani* to support the government's motion to stay pending appeal. *See* No. 05-1971 (D.D.C. Aug. 25, 2020) (ECF No. 398-1 at 33-38).

24

member detained at Guantanamo "would be unworkable" and "would result in certain undue burdens and harms":

> [DoD] would need to discuss, create, and coordinate governing guidance [for MMCs] within the highest levels of the United States Government (USG) and international partners. Given the novelty and nuances involved and the potential precedent that application of an MMC to a [Guantanamo] detainee would generate, creating the procedures and policies would require the Executive Branch to conduct extensive planning and a robust deliberative process to fully develop the standards that would apply to a non-international armed conflict . . . and specifically, [Guantanamo] detainees. These standards, policies, and procedures would require careful vetting by the military Services, multiple agencies within [DoD] . . . , the Joint Chiefs, and agencies outside DoD such as the Department of State, the Department of Justice, and the White House.

Dalbey Decl. ¶¶ 2–3; *see also supra* at 21-22. In addition, the potential need to "seek approval of" International Red Cross "appointed doctors by al-Qaida . . . would undermine the Government's policy of not negotiating with terrorist groups." *Id.* ¶ 5. A detainee like Petitioner, who is currently facing capital charges before a military commission related to his alleged role in 9/11, presents additional concerns: MMC examinations "could disrupt or complicate the ongoing prosecution efforts." *Id.* ¶ 6.

In sum, granting Petitioner's formal MMC request would force the Executive Branch to undergo a complex and novel policy process contradicting its longstanding and considered interpretation of its own treaty obligations and military regulations, and risk interfering with ongoing military commission prosecutions, all to afford relief that would only *potentially* result in Petitioner's release. Those factors strongly counsel against this Court exercising its equitable habeas corpus power over Petitioner's claim for an MMC.

25

**D.  In all events, Petitioner is not entitled to the requested injunction.**

Even if the Court were to have jurisdiction over Petitioner's MMC request, and even if the Court were to exercise that jurisdiction, Petitioner would still not be entitled to the requested injunction. Like any request for permanent injunctive relief against the federal government, Petitioner must demonstrate "actual success on the merits." *Hi-Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 13, 17 (D.D.C. 2008) (citing *Nichols v. Truscott*, 424 F. Supp. 2d 124, 143 (D.D.C. 2006)); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). Petitioner must also prove that the balance of harm as well as the public interest favors injunctive relief. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *cf. Aamer*, 742 F.3d at 1038 (applying the closely related test for preliminary injunctive relief in a Guantanamo case). Petitioner cannot make either showing.

**i.   Petitioner is not entitled to a mixed medical commission as a matter of law.**

Petitioner is not entitled to an MMC under the plain language of Army Regulation 190-8. Petitioner contends that he falls within the regulation's glossary definition of "Other Detainee," and as such is entitled to medical repatriation privileges at least until his legal status can be ascertained. *See* Pet. ¶¶ 20–21; *see also supra* at 16. As an initial matter, it would be incongruous to interpret a provision for detainees to be treated as prisoners of war, pending a status determination, to be a basis for release before such determination has been made.[8] More

---

[8] Indeed, even if Petitioner came within the Glossary definition of "Other Detainee" (as explained *infra*, he does not), it does not necessarily follow that he would be eligible to be examined for repatriation under the text of § 3-12. Other parts of AR 190-8 explicitly reference "Other Detainees" or "OD" alongside "EPWs" and "RPs." *See, e.g.*, §§ 1-4(g)(6)(d); 1-9. But § 3-12 mentions only EPW and RPs. That "material variation in terms suggests a variation in meaning." Scalia & Garner, *Reading Law* 170 (2012); *see Russello v. United States*, 464 U.S. 16, 23 (1983) (where "particular language" appears "in one section" but not "in another," "it is

fundamentally, the process and interim status of "Other Detainee[s]" in the regulation are provided "[i]n accordance with Article 5" of the Third Geneva Convention. AR 190-8 § 1-6(a). And as noted, the provisions of the Convention regarding provisional prisoner-of-war treatment and medical-repatriation privileges are part of the full protections of the Third Geneva Convention that do not apply to members of nonstate armed organizations in this non-international armed conflict. *See supra* at 12-13. Rather, the Convention entitles Petitioner to the humane treatment protections specified in article 3. *See also United States v. Hamidullin*, 888 F.3d 62, 71 (4th Cir. 2018) ("[T]here is no provision entitling combatants captured during non-international conflicts to [prisoner-of-war] status."). Further, the regulation expressly specifies that, "[i]n the event of conflicts or discrepancies between th[e] regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence." AR 190-8 § 1-1(b). So the regulation glossary definition cannot independently entitle Petitioner to medical repatriation privileges. *See Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) (to evaluate Guantanamo habeas petitioner's claim that AR 190-8 "explicitly establishes a detainee's entitlement to" relief, a court "must analyze the relevant aspects of the Geneva Convention[]" to "determin[e] whether [the petitioner] is entitled to" relief under the regulation).

DoD guidance confirms that the provisional prisoner-of-war protection provided by Article 5 of the Convention only applies in the context of international armed conflicts.  DoD Directive 2310.01E, the DoD issuance under which Army Regulation 190-8 was promulgated, provides, "*During international armed conflict*, should any doubt arise as to whether a detainee belongs to any of the categories enumerated in Article 4 of [the Third Geneva Convention] and as such is

---

generally presumed" that "the disparate inclusion or exclusion" was "intentional[] and purpose[ful]").

27

entitled to the protections and privileges afforded POWs, such detainees shall enjoy treatment as POWs until a tribunal convened in accordance with Article 5 of [the Convention] determines whether the detainee is entitled to such status or treatment." ¶ 3(h) (emphasis added)), *available at* https://perma.cc/N8ZL-T4AE.[9] *See* SecArmy Memo 1. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) (deferring to the Executive's reasonable readings of its own regulations).  DoD's Law of War Manual likewise confirms that the provisional prisoner-of-war protection provided by Article 5 of the Convention only applies in the context of international armed conflicts. *See* Office of General Counsel, U.S. Dep't of Def., *Law of War Manual* § 4.27.2 (2016), *available at* https://perma.cc/HYH5-5EYL ("*During international armed conflict*, should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 of the [Third Geneva Convention], such persons shall enjoy the protection of the [Convention] until such time as their status has been determined by a competent tribunal." (emphasis added)).

In any event, Petitioner cannot benefit from AR 190-8's provisional prisoner-of-war protection because his legal status *has* already been ascertained. In 2002, President Bush concluded that, because al-Qaida is a terrorist organization that is not and cannot be a party to the Third Geneva Convention, al-Qaida's fighters are unprivileged enemy combatants to whom the full protections of the Geneva Convention do not apply. *See* White House Press Secretary announcement of President Bush's determination re legal status of Taliban and Al Qaeda detainees (Feb. 7, 2002), *available at* https://perma.cc/79EL-NGAZ; *see also Hamidullin*, 888 F.3d at 72-73

---

[9] Prior versions of DOD Directive 2310.01E have included this provision since at least 2014. *See* DoD Directive 2310.01E (issued Aug. 19, 2014), *available at* https://perma.cc/FFB4-YR67; *see also* DOD Directive 2310.01E (issued May 24, 2017), *available at* https://perma.cc/K6JK-ULLK. The current version of DOD Directive 2310.01E took effect in September 2020.

(holding the President is a competent authority to determine a detainee's legal status for Army Regulation 190-8); *Hamdan*, 415 F.3d at 43 (same), *rev'd on other grounds*, 548 U.S. 557. And Petitioner was specifically determined to be an enemy combatant—that is, part of al-Qaida—by a Combatant Status Review Tribunal in 2007. *See* Action Memo for Designated Civilian Officer from Convening Authority, Combatant Status Review Tribunal (Apr. 30, 2007) (attached as Exhibit C); Unclassified Summary of Basis for Tribunal Decision (attached as Exhibit D); *see also* Respondents' Status Report, *Al-Hawsawi v. Bush*, No. 08-cv-1645 (RJL) (D.D.C. Nov. 21, 2008) (ECF No. 7). Additionally, when Petitioner challenged the military commission's jurisdiction to try him for his alleged role in 9/11, the presiding judge expressly ruled that Petitioner was an alien unprivileged enemy belligerent who was part of al-Qaida. *See* Ruling, *United States v. Khalid Shaikh Mohammad et al.* (Military Commissions Trial Judiciary Apr. 25, 2018), *available at* https://perma.cc/CB5Q-NMJW. This determination is inconsistent with a finding that Petitioner is entitled to be a prisoner of war who could be examined by a Mixed Medical Commission. See 10 U.S.C. § 948a (defining "unprivileged enemy belligerent" as individuals other than individuals "belonging to one of the eight categories [entitled to prisoner-of-war protection] enumerated in Article 4 of the [Third] Geneva Convention"). Accordingly, Petitioner's legal status as a detainee has been determined, and Petitioner would not be entitled to provisional prisoner-of-war protection, even if he could appeal to the definition of "Other Detainee" under Army Regulation 190-8.

*   *   *

Moreover, if any doubt remained about Army Regulation 190-8's application, the Secretary of the Army's January 2021 memo "make[s] clear" that the regulation "is not applicable to any detainees" currently held at Guantanamo. SecArmy Memo 2. Rather, under applicable DoD policy,

29

these "unprivileged belligerents" (a term "synonymous with" "unlawful enemy combatants") are entitled to "the minimum standards of treatment" set forth in DoD Directive 2310.01E, including Article 3 of the Convention. *Id.* at 1. As the memo explains, and as is made clear in DoD Directive 2310.01E and in Article 3, those humane treatment standards include safeguards to protect health and hygiene and appropriate medical care and attention, but do not include the privileges attendant to "prisoner of war status or treatment, including such treatment or protections on a provisional basis pending a status determination." *Id.*; *see also* DoD Directive 2310.01E, ¶ 3(b)(1)(c)–(d); *Law of War Manual* § 17.2 ("[I]n the 1949 Geneva Conventions, only [] Article 3 applies to non-international armed conflict.").[10]

---

[10] The memo was properly issued and is consistent with existing law. The Secretary of the Army issued the memo in his capacity "as the promulgating official for AR 190-8 and the DoD Executive Agent under DoD Directive 2310.01E." SecArmy Memo 2. Indeed, the regulation identifies the Secretary as the lead official on whose authority the regulation issued. *See* AR 190-8 at i. As the regulation notes, the Secretary assigned responsibilities to the Deputy Chief of Staff for Operations and Plans as the regulation's "proponent," who "has the authority to approve exceptions to th[e] regulation that are consistent with controlling law and regulation." *Id.* But that assignment was perfectly consistent with the Secretary's authority. *See* 10 U.S.C. §§ 7013, 7031, 7032; *United States v. Hennis*, 75 M.J. 797, 804-05 (A. Ct. Crim. App. 2016), *aff'd*, 79 M.J. 370 (C.A.A.F. 2020). And "it is well established that the head of an agency retains the authority to make final decisions for the agency even if he or she delegates the authority to make these decisions to his or her subordinates." *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 9-10 (D.D.C. 2000) (citing *Knight v. United Land Ass'n*, 142 U.S. 161, 176-82 (1891)); *see also Morrow v. Clayton*, 326 F.2d 36, 45-46 (10th Cir. 1963) ("[T]he head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior."). "To hold otherwise would create havoc in the administration of our laws." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1388 (5th Cir. 1979). *See generally* DoD Directive 2310.01E ¶¶ 1.c & 9.a (Sep. 18, 2020) (designating the Secretary as the Executive Agent "for the administration of the DoD Detainee Program" and for "DoD detainee operations policy"), *available at* https://perma.cc/N8ZL-T4AE; AR 190-8 at i ("implement[ing]" DOD Directive 2310.01E); *id.* at § 1-4(b) ("The Secretary of the Army is the DOD Executive Agent [] for administering the DOD EPW, CI and RP Program" in charge of "plan[ning] and develop[ing] the policy and coordinat[ing] the operation of the programs."); DoD Directive 5101.1 ¶ 4.4 (noting that an Executive Agent's "authority takes precedence over the authority of other DoD Component officials"), *available at* https://perma.cc/R3UL-JDPD.

### ii.     The balance of harm and the public interest weigh against the requested injunction.

The balance of harm and the public interest overwhelmingly counsel against an injunction. As noted above, an injunction would come at a great cost to the Executive and to the public interest: a formal MMC under AR 190-8 would precipitate a delicate, demanding, and unprecedented policy process that risks disturbing the detention facility's safe and orderly operation, disrupting the ongoing efforts to bring the 9/11 perpetrators to justice and to protect national security, and incentivizing detainees to refuse medical treatment and otherwise engage in self-harm. And at the same time, Petitioner has little to gain from the requested injunction: an injunction would not guarantee his release or even make release more likely. In the meantime, Petitioner will continue to have comprehensive medical care available to him, administered by qualified military staff duty-bound to protect his physical and mental health. In this case, the balance of harm and the public interest tip decisively in the Executive's favor.

\*     \*     \*

Finally, besides asking this Court to convene an MMC, Petitioner appears to presuppose any commission's decision, as well as the Executive's consent to implement that decision, by further requesting the Court to "order Respondents to repatriate Petitioner to the Kingdom of Saudi Arabia." Pet. 20. Even if the Court could order DoD to convene an MMC to examine Petitioner in the first instance (for the reasons above, it cannot—or at least should not), and even if Petitioner could demand an MMC (he cannot), this second-order relief of compelled repatriation is (at the very least) premature.[11]

---

[11] What is more, the most this Court could order would be release, not repatriation to a specific country. *See, e.g.*, *Ahmed v. Obama*, 613 F. Supp. 2d 51, 66 (D.D.C. 2009) (granting habeas corpus relief, but "[m]indful of the limitations on the scope of the remedy in this situation," merely ordering "the Government to take all necessary and appropriate diplomatic steps to facilitate Petitioner's release").

31

## CONCLUSION

Because Petitioner fails to establish deliberate indifference, because the Court cannot and should not order that a mixed medical commission be convened, and because Petitioner is not entitled to a mixed medical commission or repatriation in any event, the Court should dismiss or deny Petitioner's petition for a writ of habeas corpus and enter judgment for Respondents.

Dated: February 2, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

TERRY M. HENRY
Assistant Branch Director

*/s/ Kevin Wynosky*
Indraneel Sur
Kevin Wynosky (PA Bar No. 326087)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W., Rm. 12400
Washington, DC 20005
(202) 616-8267
Kevin.J.Wynosky@usdoj.gov

*Attorneys for Respondents*

33

## CERTIFICATE OF SERVICE

On February 2, 2022, I electronically submitted this document to the clerk of court of the U.S. District Court for the District of Columbia using the court's electronic case filing system.  I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Kevin Wynosky*
Kevin Wynosky
Trial Attorney
U.S. Department of Justice