**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MUSTAFA AHMED AL-HAWSAWI,<br><br>Petitioner,<br><br>v.<br><br>JOSEPH R. BIDEN JR. *et al.*,<br><br>Respondents. | Civil Action No. 21-2907 |

**RESPONDENTS' REPLY MEMORANDUM SUPPORTING
MOTION TO DISMISS OR FOR JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

TERRY M. HENRY
Assistant Director

INDRANEEL SUR
KEVIN WYNOSKY
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.     The Court should grant judgment for Respondents on Petitioner's Eighth
Amendment claim. ................................................................................................. 3

        A.     Judgment for Respondents is procedurally proper because the government
is entitled to judgment as a matter of law. ............................................... 3

        B.     Judgment for Respondents is substantively proper because Petitioner fails
to establish that the Joint Task Force Guantanamo medical staff has been
deliberately indifferent to his medical needs. .......................................... 5

               1.     Dr. Lax's diagnosis of functional constipation lacks support and
does not support a finding of deliberate indifference in any event,
but even if Petitioner has functional constipation, the Joint Task
Force Guantanamo medical staff has provided appropriate treatment. ...... 5

               2.     Petitioner cannot show that the medical care he has received
amounts to deliberate indifference. ............................................... 9

                    i.     Petitioner's anal pain lacks the severity necessary for
deliberate indifference. ................................................. 10

                    ii.     Petitioner does not establish that the Joint Task Force
Guantanamo medical staff subjectively knew and
disregarded the role any past trauma may have played in his
anal pain. ...................................................................... 12

II.    The Court should dismiss or deny Petitioner's MMC claim. .......................................... 14

        A.     The Court lacks habeas jurisdiction over probabilistic claims only
potentially resulting in release. ............................................................... 14

        B.     Equitable principles counsel against compelling the United States to
convene an MMC in conflict with longstanding Executive policies on
military operations and international affairs. ............................................ 18

        C.     The Court need not reach the validity of the Secretary of the Army's
memo, but it would defeat Petitioner's MMC claim in any event. ........................ 19

CONCLUSION .................................................................................................................. 22

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Aamer v. Obama*,
58 F. Supp. 3d 16 (D.D.C. 2014) ...................................................................................... 15

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) .................................................................................... 3, 17

*Abbott v. Abbott*,
560 U.S. 1 (2010) ...................................................................................................... 18, 19

*Abdulrazzaq v. Trump*,
422 F. Supp. 3d 281 (D.D.C. 2019) ............................................................................. 3, 11

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ......................................................................................... 18

*al-Bihani v. Obama*,
590 F.3d 866 (D.C. Cir. 2010) ......................................................................................... 3, 4

*al Odah v. United States*,
346 F. Supp. 2d 1 (D.D.C. 2004) ...................................................................................... 17

*al-Qahtani v. Biden*,
No. 05-1971, 2022 WL 910293 (Mar. 29, 2022) ................................................................ 2

*al-Qahtani v. Trump*,
443 F. Supp. 3d 116 (D.D.C. 2020) ............................................................................. 2, 15

*Am. Vaunguard Corp. v. Jackson*,
803 F. Supp. 2d 8 (D.D.C. 2011) ...................................................................................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 4

*Boumediene v. Bush*,
553 U.S. 723 (2008) ......................................................................................................... 17

*C & W Fish Co. v. Fox*,
931 F.2d 1556 (D.C. Cir. 1991) ........................................................................................ 21

*Chevron Oil Co. v. Andrus*,
588 F.2d 1383 (5th Cir. 1979) .......................................................................................... 21

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ................................................................................................ 22

*Department of Homeland Security v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ........................................................................................... 16

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ................................................................................................ 22

*Dhiab v. Obama*,
  74 F. Supp. 3d 16 (D.D.C. 2004) ........................................................................... 14

*Doe v. District of Columbia*,
  215 F. Supp. 3d 62 (D.D.C. 2016) ......................................................................... 12

*Estelle v. Gamble*,
  429 U.S. 97 (1976) .................................................................................................... 6

*Farmer v. Brennan*,
  511 U.S. 825 (1994) .......................................................................................... 10, 12

*Farnam v. Walker*,
  593 F. Supp. 2d 1000 (C.D. Ill. 2009) ................................................................... 13

*Garner v. Sumnicht*,
  554 F. App'x 500 (7th Cir. 2014) ........................................................................... 13

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) .................................................................................................. 4

*Harris v. Nelson*,
  394 U.S. 286 (1969) ................................................................................................ 17

*Kendall v. Kittles*,
  No. 00-628, 2004 WL 1752818 (S.D.N.Y. Aug. 4, 2004) ...................................... 10

*Kiyemba v. Obama*,
  561 F.3d 509 (D.C. Cir. 2009) ............................................................................... 17

*Knight v. United Land Ass'n*,
  142 U.S. 161 (1891) ................................................................................................ 21

*Morrow v. Clayton*,
  326 F.2d 36 (10th Cir. 1963) ............................................................................ 20, 21

iii

*Muhammad v. N.Y. Dep't of Corr.*,
   No. 10-1707, 2011 WL 797506 (S.D.N.Y. Feb. 3, 2011).........................................................10

*Perry v. Meade*,
   728 F. App'x 180 (4th Cir. 2018) .............................................................................................10

*Richardson v. District of Columbia*,
   322 F. Supp. 3d 175 (D.D.C. 2018) ..........................................................................................12

*Rosenblatt v. Fenty*,
   734 F. Supp. 2d 21 (D.D.C. 2010) ..............................................................................................2

*Salahi v. Obama*,
   No. 05-569, 2015 WL 9216557 (D.D.C. Dec. 17, 2015)...........................................................17

*Salazar ex rel. Salazar v. District of Columbia*,
   896 F.3d 489 (D.C. Cir. 2018).....................................................................................................3

*Scott v. Harris*,
   550 U.S. 372 (2007).....................................................................................................................4

*Service v. Dulles*,
   354 U.S. 363 (1957)...................................................................................................................21

*Skinner v. Switzer*,
   562 U.S. 521 (2011)...................................................................................................................17

*Stubbs v. Law Office of Hunter C. Piel, LLC*,
   148 F. Supp. 3d 2 (D.D.C. 2015) ................................................................................................2

*United States ex rel. Accardi v. Shaugnessy*,
   347 U.S. 260 (1954)...................................................................................................................21

*United States v. Abu Ghayth*,
   945 F. Supp. 2d 511 (S.D.N.Y. 2013)........................................................................................12

*United States v. Hamidullin*,
   888 F.3d 62 (4th Cir. 2018) .......................................................................................................19

## Statutes

10 U.S.C. § 7013.............................................................................................................................21

10 U.S.C. § 7023.............................................................................................................................21

28 U.S.C. § 2241.............................................................................................................................14

28 U.S.C. § 2248 .......................................................................................................... 4

**Rules**

Fed. R. Civ. P.56 ......................................................................................................... 3

Fed. R. Civ. P. 81 ........................................................................................................ 3

**Other Authorities**

Army Regulation 190-8 ........................................................................................... *passim*

DoD Directive 2310.01E ........................................................................................... 20

**INTRODUCTION**

While being prosecuted before a military commission on capital charges relating to his alleged role in the September 11, 2001 terrorist attacks, Petitioner Mustafa Ahmed al-Hawsawi filed this habeas corpus petition raising two claims. *First*, he alleges that the medical staff of Joint Task Force Guantanamo, at Naval Station, Guantanamo Bay, Cuba violated the Eighth Amendment by exhibiting deliberate indifference to his medical needs. *Second*, he asks the Court to compel his examination by a mixed medical commission (MMC), an entity contemplated under the Third Geneva Convention to evaluate medical-repatriation eligibility for enemy detainees entitled to prisoner-of-war status and not facing criminal prosecution. The government moved for judgment on the former claim and moved to dismiss or for judgment on the latter claim. *See* ECF No. 12. Following that motion, at Petitioner's request, the government provided thousands of pages of medical records spanning Petitioner's time in CIA custody and at Guantanamo. After engaging an expert witness to review those records, Petitioner filed his opposition. *See* ECF No. 26. That opposition is revealing in several respects.

*First*, Petitioner acknowledges the government's efforts to treat his various colorectal and digestive conditions. *See, e.g.*, Opp. 4 (recounting the "numerous consults and surgeries" the medical staff has undertaken "[t]o address [Petitioner's] anal fissures, hemorrhoids, and severe constipation"). But he dismisses these efforts in favor of a "magic bullet" theory attributing all of his various conditions to a single cause: "Functional Constipation, a recognized Disorder of the Gut–Brain Interaction." *See id.* at 4-5. But Petitioner's theory—cherry-picked from a 2021 book that, properly contextualized, actually supports Petitioner's current plan of care—at most represents a difference of medical opinion with the Joint Task Force Guantanamo medical staff, who believe Petitioner's conditions are complex and multifactorial. Petitioner's theory also proves too much; although his Petition asks for "a plan to be submitted on how the Government will provide the appropriate treatment for [Petitioner]'s condition," *id.* at 26, his retained expert now opines that Petitioner's condition "is unable to be resolved while he is at Guantanamo Bay," *id.* ex. 2 ¶ 30.

*Second*, as to his MMC claim, Petitioner urges this Court to follow Judge Collyer's opinion in *al-Qahtani v. Trump*, 443 F. Supp. 3d 116 (D.D.C. 2020). That case granted a request from another Guantanamo detainee, who was not before a military commission, for an MMC based on the conclusion that MMCs represent "nondiscretionary release mechanism[s]" "enforce[able]" through "[h]abeas." *Id.* at 127-28. Whatever one thinks of that conclusion (in the government's view, it was mistaken[1]), Petitioner never responds to the government's point (at 23) that "because Petitioner is a military commission defendant, even if an MMC deemed Petitioner eligible for medical repatriation, the Executive would not have to repatriate him until commission proceedings concluded and the Petitioner served any sentence." As the government's opening brief explained—and Petitioner does not rebut—that fact distinguishes *al-Qahtani* in all events, because even an MMC determination favorable to Petitioner would implicate considerable Executive discretion on whether and when Petitioner would be released. *See generally Stubbs v. Law Office of Hunter C. Piel, LLC*, 148 F. Supp. 3d 2, 4 (D.D.C. 2015) (collecting cases holding that "[a]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded" (quoting *Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010))).

Petitioner's opposition falls short in other ways, too. Besides citing *al-Qahtani* (which is at best persuasive authority), Petitioner never squares his purported right to an MMC with the Geneva Conventions or Army Regulation 190-8 (AR 190-8), which offer MMCs only to prisoners of war detained during international armed conflicts—not to unprivileged enemy combatants detained in non-international armed conflicts like Petitioner. Nor does he confront the fact that his status as an unprivileged enemy combatant has been determined (more than once), foreclosing any hope of enjoying provisional prisoner-of-war status under AR 190-8. Nor does he respond to the government's points about the balance of the harms and the public interest—factors on which he

---

[1] Judge Collyer's opinion was the subject of a pending motion for reconsideration when the government relinquished custody of the petitioner, rendering the case moot. *See* Mot. Reconsideration, *al-Qahtani v. Biden*, No. 05-1971 (D.D.C. Jan. 15, 2021) (ECF No. 407); *al-Qahtani*, 2022 WL 910293, at *1 (Mar. 29, 2022) (dismissing case as moot).

2

bears the burden in order to obtain an injunction compelling an MMC. *See Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018).

For these reasons, as well as for those explained in the government's opening brief, the Court should dismiss or deny the petition for a writ of habeas corpus.

## ARGUMENT

**I. The Court should grant judgment for Respondents on Petitioner's Eighth Amendment claim.**

**A. Judgment for Respondents is procedurally proper because the government is entitled to judgment as a matter of law.**

Notwithstanding this Circuit's "common law" approach to Guantanamo habeas cases "eschew[ing] . . . a detailed procedural regime," *al-Bihani v. Obama*, 590 F.3d 866, 880 (D.C. Cir. 2010), Petitioner spends several pages arguing generally that the Federal Rules of Civil Procedure constrain Guantanamo habeas courts, and specifically that this Court must evaluate the government's motion for judgment under Federal Rule of Civil Procedure 56. *See* Opp. 7-9. But Petitioner missteps in both directions.

Generally, although Guantanamo habeas courts may analogize to the Federal Rules when faced with "scant" Guantanamo-specific authority, *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 285-87 & n.4 (D.D.C. 2019) (Sullivan, J.), they need not "follow the standard for addressing motions to dismiss and motions for judgment as a matter of law as required in a civil action outside of the [Guantanamo] habeas context," *al Kandari v. United States*, No. 15-329, redacted slip op. at 11 (D.D.C. Aug. 31, 2015) (Kollar-Kotelly, J.) (ECF No. 24). Rather, D.C. Circuit law merely requires the government to respond to a Guantanamo habeas petition in a way that gives the petitioner a "meaningful opportunity to demonstrate" that his confinement violates governing law. *al-Bihani*, 590 F.3d at 875; *see also Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) (applying the meaningful-opportunity standard to a conditions-of-confinement claim). *See generally* Fed. R. Civ. P. 81(a)(4) (the Federal Rules "apply to proceedings for habeas corpus" only "to the extent that the practice in those proceedings . . . has previously conformed to the

practice in civil actions"); *al-Bihani*, 590 F.3d at 876 (noting both that "[h]abeas review for Guantanamo detainees need not match the procedures developed by Congress and the courts specifically for habeas challenges to criminal convictions" and that "any argument equating" Guantanamo habeas petitions "with all the accoutrements of habeas for domestic criminal defendants is highly suspect").

And Petitioner's appeal to Rule 56's requirement that a court draw all legitimate factual inferences to benefit the nonmoving party in assessing whether a genuine issue of material fact exists is specifically inapposite. That summary-judgment-stage rule follows analytically from the rule "that a court must accept a complaint's allegations as true" at the motion-to-dismiss stage; Rule 56 tailors Rule 12's "tenet" for a post-discovery posture. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *see Scott v. Harris*, 550 U.S. 372, 378 (2007) (the Rule 56 standard "usually means adopting . . . the plaintiff's version of the facts"). But unlike a complaint in ordinary civil litigation, factual allegations in Guantanamo habeas petitions receive no presumption of truthfulness when the government puts forth "credible evidence" demonstrating the lawfulness of a petitioner's detention. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004); *see also* 28 U.S.C. § 2248 (allegations in return, unless traversed, are presumed true). Simply put, the standard applicable to Rule 56 motions in ordinary civil litigation gives way to a "meaningful review" standard in Guantanamo habeas litigation.

Here, the government put forth declarations from the Senior Medical Officer (SMO) for High Value Detainees, *see* ECF No. 13 [hereinafter 1/31/22 SMO Decl.],[2] and from Steven W. Dalbey, then the Director for the Office of Detainee Policy in the U.S. Department of Defense (DOD), *see* ECF No. 12-2. Petitioner submitted declarations by two retained experts—Dr. Stephen Xenakis, ECF No. 22-2 [hereinafter Xenakis Decl.], and Dr. James Lax, ECF No. 22-1 [hereinafter

---

[2] Although this declaration was classified, an unclassified version of the declaration and accompanying supplement is filed herewith as Exhibit 2. Because the declaration addresses medical information regarding Petitioner and he has not consented to filing the unclassified version publicly, it is filed under seal.

Lax Decl.]—as well as excerpts from two pieces of literature that Dr. Lax relied on to formulate his opinions: a 2021 book by Douglas A. Drossman, MD & Johannah Ruddy, MEd entitled *Gut Feelings*, ECF No. 26-6, and a February 2021 article by Ana Carla S. P. Schipper *et al.* entitled *Uncovering Re-traumatization Experiences of Torture Survivors in Somatic Health Care*, ECF No. 26-7. The government now submits the current SMO's rebuttal declaration, which is filed under seal given the presence of CUI. *See* Exhibit 3 [hereinafter 3/17/23 SMO Decl.]. The Court can accord Petitioner meaningful review based on these submissions. And as the next Section explains, these submissions entitle the government to judgment on Petitioner's Eighth Amendment claim.

**B. Judgment for Respondents is substantively proper because Petitioner fails to establish that the Joint Task Force Guantanamo medical staff has been deliberately indifferent to his medical needs.**

The opposition acknowledges (at 9) that Petitioner must establish deliberate indifference to prevail on his Eighth Amendment claim. The opposition tries establishing deliberate indifference in two ways: *first*, claiming that Petitioner has a "Dysfunction of the Gut-Brain Interaction" (DGBI) for which the Joint Task Force Guantanamo medical staff has failed to provide the requisite treatment; and *second*, claiming that the medical staff is deliberately indifferent to Petitioner's anal pain at any rate. But as explained below, neither amounts to deliberate indifference.

**1. Dr. Lax's diagnosis of functional constipation lacks support and does not support a finding of deliberate indifference in any event, but even if Petitioner has functional constipation, the Joint Task Force Guantanamo medical staff has provided appropriate treatment.**

Petitioner seeks to turn this into a case of dueling medical opinions. Based on the *Gut Feelings* book and Schipper *et al.* article (which does not discuss DGBI, but rather patient re-traumatization), Dr. Lax believes that Petitioner suffers from functional constipation, a DBGI which he characterizes as requiring "a strong and consistent doctor–patient relationship" and "a holistic" "patient-centered" "approach to treating [his] physical and psychological symptoms." Lax Decl. ¶ 14. Yet the current SMO reviewed the same literature and disagreed with Dr. Lax's

5

conclusions. *See* 3/17/23 SMO Decl. ¶¶ 3–4. Differing medical opinions do not prove deliberate indifference: "the question whether [certain] diagnostic techniques or forms of treatment [are] indicated is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

A hypothetical failure to diagnose Petitioner with functional constipation could not establish deliberate indifference, either. Neither "an inadvertent failure to provide adequate medical care," nor "negligen[ce] in diagnosing or treating a medical condition" could "be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" which is necessary to "state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 105-06. Of course, no such inadvertence or negligence is involved in this case.

Petitioner claims (at 14) that "[t]here is a genuine material fact whether [Petitioner]'s DGBI was so obvious that the [] medical staff at Guantanamo Bay realized it," but there is not. The prior SMO stated that he was unaware of "literature . . . link[ing] trauma to the lower colon with" DGBI, 1/31/22 SMO Decl. ¶ 20, and the current SMO disagrees with Dr. Lax's diagnostic conclusion, *see* 3/17/23 SMO Decl. ¶ 4. Although the opposition chides the prior SMO for his statement based on Dr. Lax's contrary opinion, *see* Opp. 15 ("a reasonable GI doctor would have strongly suspected that DGBI was a likely cause of [Petitioner's] colorectal symptoms"), Dr. Lax relies solely on a 2021 book about DGBI published in the months preceding the prior SMO's declaration. The book is, by its own description, a departure from traditional research techniques grounded in "epidemiology or basic sciences" and a "break[]" from the "dualistic thinking" prevailing in "Western medicine." ECF No. 26-6 at Bates 4, 6-8, 15. Even the term "Disorders of Gut–Brain Interaction" is new, resulting from a "recent[] change[]" aspiring to "legitimize[]" the disorders "for patients and clinicians." *Id.* at Bates 4. Yet despite DGBI's relatively recent arrival "on the map" (as the book puts it, *id.* at Bates 5), the SMO's declaration evinces his grip on the current state of research. *Compare* 1/31/22 SMO Decl. ¶ 20 (observing "mounting interest in determining how the overall health and internal fauna of the gut can contribute to or otherwise influence neuropsychiatric disorders"), *with* ECF No. 26-6 at Bates 9 & fig.9 ("defin[ing]" DGBI as the

6

interaction between "pscyhosocial factors" and, *inter alia*, "[a]ltered microflora" and other "changes in the healthy gut microbial environment").

More to the point, the *Gut Feelings* excerpt does not link sexual trauma or abuse to the lower colon with functional constipation either.[3] Rather, any mention of trauma or abuse in the excerpt lands far afield from Dr. Lax's purported diagnosis. The book's preface expresses the author's "growing disillusion with the scientific understanding of" gastrointestinal "disorders" through an anecdote about "women with chronic GI symptoms [who] had a history of early abuse and trauma" that "had severe adverse effects on GI health and clinical outcomes." ECF No. 26-6 at Bates 4. A section on "Centrally Mediated Abdominal Pain Syndrome" observes that "post-traumatic stress disorder often co-occur[s]," but Dr. Lax does not diagnose Petitioner with that particular DGBI (let alone PTSD). *Id.* at Bates 13. Finally, a section on "Functional Defecation Disorders" (FDD)—another DGBI that Dr. Lax does not diagnose Petitioner with (though some FDDs share symptoms with functional constipation)—observes that "a high proportion of patients with FDD have a childhood history of sexual abuse," which "contributes to the inability to relax the pelvic floor because of anxiety and psychological stress that increases pelvic floor muscle tension." *Id.* at Bates 14; *cf. id.* at Bates 12 (noting most patients with functional constipation do not have an FDD). But even then, the excerpt notes the "good news" that "just as the muscles have become conditioned not to relax, they can be re-trained to relax appropriately" through "pelvic floor exercises," *id.* at Bates 14—which Petitioner already receives, 1/31/22 SMO Decl. ¶ 13; *see also id.* at p. 22 (Petitioner previously "refused female provider" for "pelvic floor PT" in 2018).

Indeed, if anything, the *Gut Feelings* excerpt provided to the Court effectively endorses the Joint Task Force Guantanamo medical staff's treatment approach. The book notes that "[t]reatment" for functional constipation "can begin with a high-fiber diet or fiber supplement"

---

[3] Nor does Dr. Lax's declaration. Although Paragraph 22 purports to "contra[dict ] the SMO's assertion that there is no literature linking trauma to the lower colon with" DGBI, Dr. Lax merely goes on to offer the conclusory assertion that "prolonged and untreated Functional Constipation can result in a myriad of other GI and colorectal issues."

and, if necessary, a "[s]aline laxative[]" like "Miralax," ECF No. 26-6 at Bates 12—exactly how Petitioner's treatment began, *see* 1/31/22 SMO Decl. at pp. 11-12, 14-15, 17, 19-21, 28. "When the patient has not responded to diet or over-the-counter medications," the book recommends a "prescription medicine[]" like "Linzess," ECF No. 26-6 at Bates 12—exactly what the SMO gave Petitioner here, *see* 1/31/22 SMO Decl. at p. 25. Although Dr. Lax omits the rest of the book's discussion on functional constipation from the excerpt, it seems fair to say that rather than showing that "the Guantanamo medical staff proceeded with a blatantly inappropriate course of treatment," Opp. 20 (cleaned up), Petitioner's underlying source on DGBI actually ratifies the treatment provided.

In a similar way, Dr. Lax's other secondary source undercuts his claim that Petitioner's functional constipation cannot "be resolved while he is at Guantanamo Bay" given the alleged "occurrence of re-traumatization." Lax Decl. ¶ 30. Dr. Lax cites Schipper *et al.*'s 2021 article as the sole support for this conclusion. *See id.* But the article opens by observing that "[l]ittle research has focused on torture survivors' re-traumatization experiences in health and hospital units." *See* ECF No. 26-7 at Bates 1.[4] Then—on a page that Dr. Lax omits from the excerpt provided to the Court—the article notes that "the literature has presented conflicting data about the disclosure of torture or trauma stories as a trigger." Ex. 1 at 3. On another page that Dr. Lax excludes from the excerpt, the article explains that "the low number of available studies to assess" "limit[s]" any general conclusions; "[b]ecause our sample studies were few in number, transferring our findings to all survivors of war and torture is not possible." *Id.* at 15.

But even crediting Dr. Lax's claims about treating Petitioner in a way that minimizes potential re-traumatization, Petitioner already receives care consistent with Dr. Lax's suggestions. Consider Dr. Lax's call for "ongoing consultation with a primary gastroenterologist to provide a continuity of care and avoid cycles of misdiagnoses." Lax Decl. ¶ 14. Although the military's

---

[4] Admittedly, the quoted language comes from the abstract, not the article itself. But Dr. Lax omitted the relevant portion from his excerpt. For completeness, the government provides the full article (which discusses this point on pages 3 and 15) as Exhibit 1.

rotational construct necessitates some staff turnover, Petitioner has been provided the opportunity for regular consults with a gastroenterologist, and the Guantanamo medical staff does its best to orchestrate the same physician returning for subsequent evaluations. *See* 1/31/22 SMO Decl. ¶¶ 7, 13. Or take Dr. Lax's recommendation that "[c]linical evaluation should consider both physiological and psychiatric conditions." Lax Decl. ¶ 14. In overseeing Petitioner's care, the prior SMO noted that Petitioner had "regular[ly] interact[ed] with the resident psychiatrist," and together they would "continue to monitor [Petitioner's] mental health and his GI tract issues and explore with him various treatment modalities." 1/31/22 SMO Decl. ¶¶ 4, 20. Finally, recall Dr. Lax's suggestion for a "patient-centered" approach where "the patient is considered the source of information," "patient participation is active," and doctors "familiarize themselves with the patient's history of abuse." Lax Decl. ¶ 14. Although Petitioner has refused to fully participate in his medical treatment—and at times has intentionally undermined it—the SMO and resident psychiatrist recounted interacting with him "in a manner . . . aimed at encouraging . . . participation in medical treatment and prevention." 1/31/22 SMO Decl. ¶ 10. The SMO and psychiatrist also have "unrestricted access to all of [Petitioner's] medical records that have been generated since his arrival at Guantanamo" as well as "appropriate security clearances, and can discuss with [Petitioner] any aspect of his care or alleged treatment," though they attempt to build trust and avoid re-traumatization by "limit[ing] [their] questioning to items that are medically relevant for diagnosis and treatment." *Id.* ¶¶ 11, 13, 16–19.

So all told, neither the book nor the article that Dr. Lax cites supports his alternative diagnosis of Petitioner. And even if they did, Dr. Lax's disagreement with the SMO would still not establish deliberate indifference, not least because Petitioner's treatment parallels the treatment those sources would recommend.

**2. Petitioner cannot show that the medical care he has received amounts to deliberate indifference.**

Notwithstanding this professional disagreement over whether Petitioner should be specifically diagnosed with functional constipation, the opposition fails to establish that the

9

medical care Petitioner has received meets the two-pronged test for deliberate indifference. *First*, Petitioner must show that he objectively suffers from "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Rabbani v. Trump*, No. 05-1607, Slip Op. at 9, 12 (D.D.C. Feb. 27, 2018) (ECF No. 398). *Second*, Petitioner must show that the Guantanamo medical staff subjectively "kn[ew] of and disregard[ed]" that condition. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Because the opposition falls short on both fronts, the government is entitled to judgment on Petitioner's deliberate indifference claim.

### i.   Petitioner's anal pain lacks the severity necessary for deliberate indifference.

The opposition claims (at 12-13) that Petitioner's "anal pain" meets the deliberate-indifference standard's first prong, citing two out-of-circuit cases for the proposition that "chronic and severe pain from hemorrhoids" is "sufficient[ly]" serious as an objective matter: *Muhammad v. N.Y. Dep't of Corr.*, No. 10-1707, 2011 WL 797506 (S.D.N.Y. Feb. 3, 2011), and *Perry v. Meade*, 728 F. App'x 180 (4th Cir. 2018) (per curiam). But neither case classifies hemorrhoids as an urgent condition potentially producing death, degeneration, or extreme pain. In *Muhammad*, the magistrate judge actually cited caselaw holding that hemorrhoids "are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts" to meet deliberate indifference's first prong. *Kendall v. Kittles*, No. 00-628, 2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004), *cited with approval by Muhammad*, 2011 WL 797506, at *3. Notwithstanding that caselaw, the magistrate judge concluded that a domestic prisoner had adequately alleged a sufficiently serious medical condition in part because the alleged condition stemmed from prison staff flouting a plan prescribed by a hospital physician who treated the inmate. *See Muhammad*, 2011 WL 797506, at *3. And in *Perry*, the panel did not think that hemorrhoids alone met the objective deliberate-indifference prong, but rather hemorrhoids combined with "a five-day hospitalization and a blood transfusion due to blood loss." 728 F. App'x at 181 (emphasis added).

The opposition also cites *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 287 (D.D.C. 2019). Despite acknowledging Judge Sullivan's ultimate holding—"that the Government is not liable for deliberate indifference if [] it has evaluated, monitored, and treated [the petitioner's condition] throughout his detention," Opp. 13—the opposition tries to interpret the case to support Petitioner on the first deliberate-indifference prong. But the severity of the *Abdulrazzaq* petitioner's medical condition was not at issue. *See* 422 F. Supp. 3d at 287. Indeed, *Abdulrazzaq* involved far more than the "recommend[ation for] surgery" that Petitioner suggests (at 12): "a surgical team was flown to Guantanamo *in the midst of Hurricane Irma* to perform emergency back surgery." 422 F. Supp. 3d at 285 (emphasis added). That is precisely the sort of urgent condition that would establish the first deliberate-indifference prong.

Here, in contrast, the prior SMO described Petitioner as "clinically stable" and noted that "[d]uring temporary periods of compliance, [he] report[ed] marked improvement in his symptoms." 1/31/22 SMO Decl. ¶¶ 13–14. Although the government does not dispute that Petitioner suffers from gastrointestinal issues causing him discomfort, those issues lack sufficient severity to meet the deliberate-indifference standard's first prong. And even if those gastrointestinal issues have ever come close to the line, it would be because Petitioner refused additional treatment and ignored medical advice. Yet Petitioner cannot "artificially manufacture a deliberate indifference claim" by "refus[ing] to participate in his own healthcare, turn[ing] down repeated offers of care, and then claim[ing] medical neglect." *Rabbani*, Slip Op. at 16; *see id.* at 9 (collecting cases declining "to find that there has been deliberate indifference to a serious medical need when that medical need is the result of or exacerbated by the petitioner's voluntary decisions"); *see also* 3/17/23 SMO Decl. ¶¶ 5 & 9 (noting that Petitioner recently withdrew consent for a medical procedure citing advice of counsel).

11

### ii. Petitioner does not establish that the Joint Task Force Guantanamo medical staff subjectively knew and disregarded the role any past trauma may have played in his anal pain.

The opposition fails to establish the deliberate-indifference standard's subjective prong as well. In fact, the opposition clarifies just how narrow Petitioner's deliberate-indifference theory is. Rather than attacking the numerous interventions offered by the Joint Task Force Guantanamo medical staff, the opposition focuses its arguments on the medical staff's alleged failure to ask about Petitioner's treatment in CIA detention. *See* Opp. 16. But at most, any failure to ask about Petitioner's past treatment merely identifies another difference in medical judgment, not deliberate indifference. The prior SMO already represented that the medical staff "limit[s its] questioning to items that are medically relevant for diagnosis and treatment," not "to avoid obtaining information," but rather "to establish[] trust between the provider and the patient." 1/31/22 SMO Decl. ¶ 11. And the current SMO affirms that the Joint Task Force Guantanamo medical staff has not categorically ignored Petitioner's prior treatment when diagnosing and treating his current medical conditions. *See* 3/17/23 SMO Decl. ¶¶ 8 & 10. Put simply, despite what Petitioner says in a footnote (at 21 n.6, citing second-hand "surmise[]"by Dr. Xenakis,[5] Xenakis Decl. ¶ 9), no unwritten policy blocks inquiry about detainees' prior treatment. *See* 3/17/23 SMO Decl. ¶ 10.

As a result, this case lands far afield from the snippets of quotations Petitioner plucks from *Farmer v. Brennan*, 511 U.S. 825 (1994); *Doe v. District of Columbia*, 215 F. Supp. 3d 62 (D.D.C. 2016); and *Richardson v. District of Columbia*, 322 F. Supp. 3d 175 (D.D.C. 2018). For starters, those non-Guantanamo cases did not challenge detention medical care; all three confirm that prison staff can be subjectively indifferent if they unjustifiably disregard or bury their heads in the sand about the common-sense risk of assault when housing transgender inmates with inmates of the same biological sex. Yet if those cases have any impact here, they support the government. Any

---

[5] In a prior published opinion, the U.S. District Court for the Southern District of New York "afford[ed] minimal weight" to an opinion of Dr. Xenakis regarding an arrestee's medical condition, deeming Dr. Xenakis "obviously partisan" and characterizing his testimony as "opinions with little basis, relying predominantly on second-hand accounts and theoretical possibilities." *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 518 (S.D.N.Y. 2013).

role that Petitioner's past treatment plays in his current medical conditions is far more nuanced than the common-sense risks of housing a transgender inmate alongside inmates with the same biological sex. And to the extent Joint Task Force Guantanamo medical staff members limit asking about pre-Guantanamo treatment when it is not necessary in their opinion for diagnosis and treatment, they have a legitimate reason: building trust and provider–patient rapport.

This case lands even farther afield from *Farnam v. Walker*, 593 F. Supp. 2d 1000 (C.D. Ill. 2009). There, the prison staff knew that an inmate suffered from cystic fibrosis—a well-known, fatal disease with a median life-expectancy of thirty-seven years—yet for six years they denied him a standard airway clearance device to clear mucus from his lungs, substituted a prescription for an inhaler with an injection, made him buy necessary vitamins at the commissary, and refused to let him consult with a cystic fibrosis specialist. *See id.* at 1004-10. The opposition contends (at 17-18) that the Joint Task Force Guantanamo medical staff's failure to ask about Petitioner's prior treatment represents a like "departure from accepted medical judgment." *See also* Opp. 25 (arguing "prison medical staff [cannot] bypass[] a common treatment that would solve the inmate's serious medical problem") (citing *Garner v. Sumnicht*, 554 F. App'x 500 (7th Cir. 2014)). But the two cases could not be more different. DGBI is not cystic fibrosis—either in severity or in the degree of medical consensus on diagnosis or treatment—and the Joint Task Force Guantanamo medical staff substantively disagrees regarding a DGBI diagnosis in all events. What is more, rather than refusing medically necessary treatment, the Joint Task Force Guantanamo medical staff remains committed to "evaluat[ing] and treat[ing] all of [Petitioner's] medical concerns," including "explor[ing ] various treatment modalities" relating to "mental health and his GI tract issues." 1/31/22 SMO Decl. ¶¶ 20–21. Simply put, the Joint Task Force Guantanamo medical staff is not disregarding or burying its head in the sand regarding Petitioner's medical needs.

In the end, Petitioner's challenge to this "surmised" policy of non-inquiry presents a strawman of the Joint Task Force Guantanamo medical staff's actual practice. In that way, the opposition recalls *Dhiab v. Obama*, when another Guantanamo habeas petitioner claimed that the medical staff was deliberately indifferent because it reflexively adhered to a policy permitting

13

enteral feeding of detainees weighing less than 85% of their ideal body weight. 74 F. Supp. 3d 16, 28 (D.D.C. 2004) (Kessler, J.). But as the Court noted, the actual policy made bodyweight "only a threshold issue" that "simply trigger[ed] further medical review" before "a final determination" on medical necessity was made. *Id.* Rather, the Court acknowledged, the decision to enterally feed the petitioner was "very complicated" and "complex," arising out of "monitoring [the petitioner] closely during the period in question"—in other words, not deliberate indifference. *Id.* at 29. So too here: the medical staff's policy on inquiring into Petitioner's past treatment is considerably more nuanced than Petitioner represents, accounting for provider–patient rapport and mindful of the risks of retraumatization. *See, e.g.*, 3/17/23 SMO Decl. ¶ 10. That careful approach cannot be said to represent deliberate indifference.

## II.  The Court should dismiss or deny Petitioner's MMC claim.

Petitioner also asks this Court for an injunction compelling the government to convene an MMC under AR 190-8 to assess his eligibility for medical repatriation. The Court should dismiss this claim for three reasons: *First*, as a probabilistic claim for release, it does not sound in habeas. *Second*, equitable principles counsel against compelling the government to convene an MMC despite longstanding, contrary Executive judgments about military operations and international affairs. *Third*, although the Court need not reach the validity of the Secretary of the Army's January 2021 memo given that Petitioner is not legally entitled to an MMC, the memo would defeat Petitioner's MMC claim in all events.

### A.  The Court lacks habeas jurisdiction over probabilistic claims only potentially resulting in release.

The government's opening brief explains (at 18-23) why the Court lacks habeas jurisdiction to order the government to establish an MMC for Petitioner, citing the jurisdictional limitation on non-habeas claims contained in 28 U.S.C. § 2241(e)(2), precedent from the Supreme Court and the D.C. Circuit, and persuasive authority from other Circuits and from other Guantanamo habeas decisions. In short, probabilistic claims—claims that, like a request for an

MMC, may only potentially result in release—do not sound in habeas. By contrast, Petitioner's opposition asks the Court to look past the authorities cited by the government to two district court opinions: Judge Collyer's opinion in *al-Qahtani* and her earlier opinion in *Aamer v. Obama*, 58 F. Supp. 3d 16 (D.D.C. 2014).

The two opinions appear to contradict each other in key respects. *Aamer* correctly observes that AR 190-8 "does not . . . alter the obligations of the United States under the Geneva Conventions," 58 F. Supp. 3d at 21, which the government has explained do not grant members of nonstate armed groups engaged in a non-international armed conflict the benefits attendant to prisoner-of-war status, including medical-repatriation privileges. *See also id.* at 25-26 & n.8 (casting doubt on a Guantanamo detainee's attempt to obtain "the privileges that accrue to prisoners of war" because, among other things, the U.S.–al-Qaida conflict is "not an international armed conflict"). Yet *al-Qahtani* later misunderstood the AR 190-8 glossary definition of "Other Detainee"—a provisional prisoner-of-war status for enemy persons detained during international armed conflicts until their actual status can be determined—to stretch the Third Geneva Convention's medical-repatriation privileges to cover members of nonstate terrorist groups. *See* 443 F. Supp. 3d at 130.

On jurisdiction in particular, *Aamer* actually supports the government—not Petitioner. In *Aamer*, the petitioner did not seek MMC review; he "demand[ed] immediate release" under AR 190-8's medical-repatriation provisions. *See* 58 F. Supp. 3d at 17, 25-27. For that reason, the Court concluded that the claim fell within its habeas power "to hear challenges to the authority of the Executive to imprison a person." *Id.* at 25 (citation omitted); *see also id.* at 26 n.9 (distinguishing eligibility for release from entitlement to release). So *Aamer* actually reaffirms this Court's lack of habeas jurisdiction over probabilistic claims.

Only *al-Qahtani* purportedly recognizes habeas jurisdiction over a probabilistic claim for an MMC, based on the mistaken belief that MMCs represent "nondiscretionary release mechanism[s]." 443 F. Supp. 3d at 128. But as the government's opening brief explains (at 15 & 23), that is wrong as a general matter. Just convening an MMC requires several discretionary

steps—besides, of course, each commissioner's ultimate discretion on the eligibility determination. The opposition skates over these discretionary steps, claiming (at 27 & 31) that assembling an MMC is as simple as "coordinating with the International Committee of the Red Cross" to find "two physicians from neutral countries" plus "one medical officer from the U.S. Army." On the contrary, standing up the membership of an MMC is anything but simple: the neutral-country physicians must be approved either by the opposing side in the conflict—here, al-Qaida—or by the opposing side's protecting power (which al-Qaida does not have). *See* Opening Br. 14, 22. Besides, the Executive would also have to determine the disabilities and sicknesses qualifying for medical repatriation in the U.S.–al-Qaida conflict, as well as specific standards relating to those disabilities and sicknesses. *See id.* at 14-15, 22. The opposition does not even acknowledge these discretionary issues—let alone explain how a Court can properly compel the Executive to decide them. Nor does the opposition meaningfully distinguish *Department of Homeland Security v. Thuraissigiam*, a post–*al-Qahtani* Supreme Court case holding that habeas cannot be used "to obtain . . . administrative review" only possibly resulting in release. 140 S. Ct. 1959, 1963 (2020).[6]

*Al-Qahtani*'s characterization of MMCs as non-discretionary release mechanisms errs as a specific matter, as well. Because Petitioner faces military commission charges, unlike the petitioner in *al-Qahtani*, even if an MMC deemed him eligible for medical repatriation, the Executive need not repatriate him until commission proceedings conclude and Petitioner completes any sentence. *See* Opening Br. 15. The opposition does not even grapple with this fact, but it effectively means that Petitioner's request for an MMC does not even rise to a probabilistic claim: until Petitioner is tried and fully serves any resulting sentence, a favorable MMC determination does not entitle Petitioner to repatriation.

---

[6] The opposition mischaracterizes *Thuraissigiam* by claiming (at 33) that the petitioner there "had never been detained in the first place." *But see* 140 S. Ct. at 1967 ("Vijayakumar Thuraissigiam, a Sri Lankan national, crossed the southern border without inspection or an entry document at around 11 p.m. one night in January 2017. A Border Patrol agent stopped him within 25 yards of the border, and the Department detained him for expedited removal." (citation omitted)).

Moreover, despite what Petitioner argues, *Skinner v. Switzer*, 562 U.S. 521 (2011), and other authorities upholding the longstanding rule against probabilistic habeas claims remain applicable here. The opposition claims (at 28-29) that *Kiyemba v. Obama* and its progeny jettisoned the no-probabilistic-claims rule for Guantanamo cases. But *Kiyemba* merely holds that Guantanamo habeas courts have traditional statutory jurisdiction over claims relating to transfer "to or from a place of incarceration"—which in the Court's view included a detainee's transfer out of U.S. custody to another country. *See* 561 F.3d 509, 513 (D.C. Cir. 2009). Rather than expanding the scope of statutory jurisdiction to probabilistic Guantanamo habeas claims, *Kiyemba* merely confirms *Boumediene v. Bush*'s holding that Guantanamo detainees "ha[ve] the right to petition for habeas under § 2241." *Id.* at 512 n.2 (quoting 553 U.S. 723, 777 (2008)). To be sure, the D.C. Circuit followed *Kiyemba* with *Aamer v. Obama*, which held that § 2241 allows detainees to challenge aspects of their detention depriving them of "right[s] to which [they are] entitled while in custody" in a way that renders their detention unlawful. 742 F.3d at 1036. But the D.C. Circuit's *Aamer* decision does not help Petitioner, for at least two reasons. For one, Petitioner has no right to an MMC. Although the government agrees that "an MMC is a right established under the law," Opp. 32, it is only an entitlement for prisoners-of-war and retained personnel under the Third Geneva Convention, not for members of nonstate armed groups detained during non-international armed conflicts. *See* Opening Br. at 12-13. Also, *Aamer* does not abrogate the rule against probabilistic habeas claims. As Judge Lamberth later put it, "while *Aamer* does show that claims not relating to release may sound in habeas, it does not show that 'probabilistic' or 'discretionary' claims relating to release do so." *Salahi v. Obama*, No. 05-569, 2015 WL 9216557, at *3 (D.D.C. Dec. 17, 2015).

Neither *Harris v. Nelson*, 394 U.S. 286 (1969), nor *al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004), help Petitioner, either. Petitioner does not ask the Court for help developing or presenting facts about his detention; Petitioner asks to create a multi-member administrative body to evaluate his eligibility for medical repatriation under discretionary factual and procedural standards, an evaluation that has no bearing on the legality of his detention, including by reason

17

of his status as a military commission defendant. Contrary to what Petitioner claims (at 31 & 32), these standards are neither "ministerial" nor "already crafted." In fact, it does not appear that the United States has ever convened an MMC under the Third Geneva Convention before, even in an international armed conflict.[7] Rather, as the Dalbey Declaration explained (at ¶¶ 2 & 3)—and Petitioner does not rebut—convening an MMC for an al-Qaida member detained at Guantanamo "would be unworkable" and "would result in certain undue burdens and harms."

> **B. Equitable principles counsel against compelling the United States to convene an MMC in conflict with longstanding Executive policies on military operations and international affairs.**

To rebut the argument that equitable principles counsel against compelling the government to convene an MMC, the opposition recites cases and historical examples standing for the proposition that the Executive does not have unreviewable powers over detention or foreign affairs. But no case or example suggests that the Court should wield its equitable habeas authority in a way that intrudes upon military operations and international relations to merely offer Petitioner a potential avenue for release—not to pass on the legality of his detention.

To his credit, Petitioner concedes (at 36) that cases like *Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978), and *Abbott v. Abbott*, 560 U.S. 1 (2010), hold that courts should "refrain[] from considering a claim" when "the relief sought would have required a change to pre-existing

---

[7] The opposition argues (at 37) that using an MMC is not "complex and novel" but rather "routine" and "normal," citing DOD's Law of War Manual and a 1947 article about an MMC used from 1943 to 1945. Yet neither source establishes that an MMC would at all be "routine." The Law of War Manual merely restates (verbatim) the relevant provision from the Third Geneva Convention, and the MMC described in the article obviously predates the Third Geneva Convention, which was not completed until 1949. Nor could the procedures from a World-War-II–era MMC used to evaluate German prisoners-of-war held at a military hospital in Tennessee meaningfully translate to the procedures required to evaluate al-Qaida members detained at Guantanamo, not only because of evolving medical science but also because of the unique nature of the U.S.–al-Qaida conflict. Unlike the United States' war with Germany—a nation-state with whom the U.S. could negotiate direct repatriations—al-Qaida is a nonstate terrorist organization with which negotiation is (at best) impracticable. Likewise, German soldiers benefitted from prisoner-of-war status; al-Qaida members are unprivileged enemy combatants. *See also* Opening Br. at 21-22. At any rate, using an MMC eighty years ago does not make MMCs "routine" or "normal."

18

executive policy." But Petitioner erroneously distinguishes those cases, arguing that "the current policy of the Executive mandat[es] the use of" MMCs. Opp. 36; *accord id.* at 37 (arguing that Petitioner's "MMC request is consistent with the longstanding executive policy allowing MMCs"). Rather, convening an MMC for Petitioner would contradict at least three distinct Executive judgments on military operations and international affairs. *First*, longstanding U.S. policy maintains that members of nonstate armed groups detained during non-international armed conflicts have no right to an MMC—a prisoner of war privilege—either under the Third Geneva Convention or under AR 190-8. *Second*, convening an MMC would be impracticable at best, because it would require the government either to approve al-Qaida–appointed doctors or to work with al-Qaida's protecting power (which does not exist). *Third*, convening an MMC could disrupt or complicate the work of the military commissions. *See* Opening Br. at 24-25.

### C. The Court need not reach the validity of the Secretary of the Army's memo, but it would defeat Petitioner's MMC claim in any event.

Besides citing Judge Collyer's nonbinding *al-Qahtani* opinion, the opposition offers no affirmative argument for why Petitioner—whom the Executive has deemed an unprivileged enemy combatant detained in a non-international armed conflict—merits provisional prisoner-of-war status as an "Other Detainee" under AR 190-8, a regulation merely implementing the Geneva Conventions. *See* AR 190-8 § 1-1(b) ("In the event of conflicts or discrepancies between th[e] regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence."). Nor does the opposition dispute that, although certain protections of the Third Geneva Convention apply to the U.S.–al-Qaida conflict, because al-Qaida is not a Power accepting and applying the Convention, the Convention only entitles detained al-Qaida members to the humane treatment protections specified in Article 3, which do not include actual or provisional prisoner-of-war status. *See* Opening Br. at 12-13; *see also United States v. Hamidullin*, 888 F.3d 62, 71 (4th Cir. 2018) ("[T]here is no provision entitling combatants captured during non-international conflicts to [prisoner-of-war] status."). Nor does the opposition explain why, even if Petitioner could qualify as an "Other Detainee," he would be eligible for an MMC under AR 190-

19

8 § 3-12. Unlike other AR 190-8 provisions that specifically reference application to "Other Detainees," § 3-12 by its terms only contemplates MMCs for "Enemy Prisoners of War" or "Retained Persons"—underscoring *al-Qahtani*'s error in interpreting a provision allowing certain detainees to be treated as prisoners-of-war pending a status determination to be a basis for release before (according to *al-Qahtani*, anyway) that status determination was made. *See* Opening Br. at 26-27. Rather, the opposition takes aim at the administrative validity of the Secretary of the Army's January 2021 memo, which "make[s] clear" that AR 190-8 "is not applicable to any detainees" currently held at Guantanamo, who are instead entitled to "the minimum standards of treatment" set forth in DOD Directive 2310.01E, which include the Geneva Convention's Article 3 protections, but not "prisoner of war status or treatment, including such treatment or protections on a provisional basis pending a status determination." *See* ECF No. 12-1 at 1-2.

Because the Secretary's January 2021 memo merely restates the Executive's longstanding (and correct) view of governing law, *see* Opening Br. at 29-30, the Court need not pass on Petitioner's challenges to the validity of the memo. But those challenges fall flat in all events. Petitioner does not even attempt to reconcile his first contention—that AR 190-8 reserves exemption authority to the Army's Deputy Chief of Staff—with *Morrow v. Clayton*, which held that "the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior." 326 F.2d 36, 45-46 (10th Cir. 1963), *cited at* Opening Br. 30 n.10. And his second contention—that AR 190-8's interservice nature prohibits a unilateral exemption by the Secretary of the Army—runs aground on DOD Directive 2310.01E, which identifies the Secretary of the Army as the DOD Executive Agent. Besides, both contentions flow from the mistaken premise that the regulation would otherwise entitle Petitioner to an MMC. Rather, the Secretary's memo confirms the contrary: neither the Geneva Conventions nor AR 190-8 entitle Petitioner to an MMC.

Next, the opposition (at 40) contends that "long standing principles of administrative law" establish that agency officials do not retain authority over subordinates exercising delegated

authority "absent express reservation of power in superior officer." But the opposition's cited cases do not delimit some abstract constraint on delegated authority. Rather, each case measured challenged conduct against a particular agency delegation. *See United States ex rel. Accardi v. Shaugnessy*, 347 U.S. 260, 267 (1954) (Board of Immigration Appeals failed to exercise discretion as Attorney General's regulation required); *Service v. Dulles*, 354 U.S. 363, 388 (1957) (Secretary of State improperly terminated employee absent Deputy Under Secretary's recommendation as required under agency manual); *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1560 (D.C. Cir. 1991) (official properly exercised delegated authority based on pertinent agency orders' plain language); *Am. Vaunguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 14 (D.D.C. 2011) ("Having reviewed these records [submitted by the agency], the Court finds nothing . . . to establish any transfer of FIFRA-related authority to the Director of the W&C Division."). If anything, "general proposition[s] of administrative law" point in the opposite direction: "the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior." *Morrow*, 326 F.2d at 45-46 (citing *Knight v. United Land Ass'n*, 142 U.S. 161, 176-82 (1891)). "To hold otherwise would create havoc in the administration of our laws." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1388 (5th Cir. 1979).

Finally, even crediting the opposition's mistaken understanding of administrative law, the opposition does not acknowledge statutes like 10 U.S.C. § 7013(b), which makes the Secretary of the Army "responsible for," and gives him "the authority necessary to conduct, all affairs of the Department of the Army." Or like 10 U.S.C. § 7013(f), which requires "[o]fficers of the Army" to "report" to "the Secretary" on "any matter." Or like 10 U.S.C. § 7023(b), which specifies that the Army's Deputy Chief of Staff acts "[u]nder the authority, direction, and control of" the Secretary. Nor does the opposition grapple with the numerous DOD regulations cited in the government's opening brief (at 30 n.10) buttressing the Secretary's superintendent role over AR 190-8. At the very least, given these statutes and regulations, as well the Secretary's explicit role as AR 190-8's "promulgating official," the Secretary's understanding of his authority merits deference. *See Dep't*

21

*of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); *cf. City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's interpretation of its authority is entitled to deference).

## CONCLUSION

For these reasons, as well as for those explained in the government's opening brief, the Court should dismiss or deny the petition for a writ of habeas corpus and enter judgment for the government.

Dated: March 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

TERRY M. HENRY
Assistant Branch Director

*/s/ Kevin Wynosky*
Indraneel Sur
Kevin Wynosky (PA Bar No. 326087)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W., Rm. 12400
Washington, DC 20005
(202) 616-8267
Kevin.J.Wynosky@usdoj.gov

*Attorneys for Respondents*

22

## CERTIFICATE OF SERVICE

On March 17, 2023, I electronically submitted this document to the clerk of court of the U.S. District Court for the District of Columbia using the Court's electronic case filing system.  I certify that I have served all parties electronically or another way authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Kevin Wynosky*
Kevin Wynosky
Trial Attorney
U.S. Department of Justice